**UNITED STATES**

v.

**HERSKOVITZ et al.**

**No. 121, Docket 22880.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 14, 1953.

Decided Jan. 25, 1954.

Curran, Mahoney, Cohn & Stim, New York City, Menahem Stim and Albert A. Blinder, New York City, of counsel, for appellants.

J. Edward Lumbard, U. S. Atty., New York City, Leonard Maran and James B. Kilsheimer, III, Asst. U. S. Attys., New York City, of counsel, for appellee.

Before SWAN, FRANK and MEDINA, Circuit Judges.

MEDINA, Circuit Judge.

Appellants Fred Herskovitz and Elias Berger, together with co-defendant Doris Sobel, were indicted in 10 counts for wilfully aiding, assisting in and counseling, procuring and advising the preparation of false and fraudulent income tax returns, on or about the 15th day of March, 1950, in violation of Title 26, United States Code, § 3793(b). Each of the three defendants was named in three substantive counts, and the 10th count of the indictment charged the same defendants with conspiracy.

On June 18, 1953, after trial in the United States District Court for the Southern District of New York, defendant Herskovitz was convicted on three counts, defendant Berger on two counts, and defendant Sobel acquitted on all counts in which she was named, the conspiracy count as to all the defendants having been dismissed by the trial court at the conclusion of the government's case. The Court sentenced Herskovitz to concurrent terms of 3 years on each of the 3 counts, and imposed a committed fine of $5,000 on each count; Berger was

sentenced to concurrent terms of 1 year and 1 day on the 2 counts. From these judgments of conviction Herskovitz and Berger appeal.

The facts in the case are substantially these. From 1948 to 1950, appellant Herskovitz was a certified public accountant and appellant Berger was a public accountant. They had adjoining offices in suite 903 at 1457 Broadway, New York City. Herskovitz was Berger's father-in-law and while each apparently had his own "regular clients," the two were partners in the "business of making income tax returns" for "transient" taxpayers. During the "tax season" between the months of January and April, "transient" taxpayers would request assistance in the preparation of Federal and State income tax returns at the suite of offices just described. The scheme practiced by appellants to defraud the United States consisted of padding deductions on these returns so that every return, when filed, requested a refund from the government.

To carry out this scheme, appellants conducted what can best be described as a "refund factory." The *modus operandi* was this: Upon the arrival of a taxpayer, the receptionist would request the individual's statement of moneys withheld (W–2 Form) and would then inquire whether during the prior years, returns were filled out at the same office. If such was the case, the prior year's file was obtained, and the taxpayer instructed to wait until an office was available for an interview. Ten taxpayers and one government agent testified about their interviews in appellants' offices. Although Herskovitz would not admit how many taxpayers he interviewed, other than that it was less than 5,000 in 1950, taxpayers called as witnesses by the government testified that they endured long waiting periods before being interviewed, and that, when occasion demanded, they were given numbers to determine their turn. The evidence indicates that the "factory" did a thriving business.

When his turn was reached, the taxpayer was ushered into the inner offices for the interview. These interviews were conducted in the main by the appellants, the defendant Doris Sobel, Herskovitz's daughter, one Silverman, another of Herskovitz's sons-in-law, and Allan Shoopak, an employee. When business improved, a basement office was also rented to interview taxpayers, and, to further accommodate these "transients," the appellant Herskovitz during the tax season of 1950 had temporary offices at the Hotel Dixie and in Yonkers. These offices were staffed by the same personnel, augmented by temporary employees.

A mimeographed worksheet, listing every possible deduction that could be taken for a taxpayer, was used by the interviewer. The interview lasted no more than 10 or 15 minutes, and at its conclusion the tax was computed on the worksheet and the taxpayer advised of the amount of refund that he would receive. The taxpayers testified that the names of organizations listed under contributions, the deductions taken for charitable contributions, and the deductions taken for New York City Sales Tax, Miscellaneous Tax, doctors and dentists, medications, work-clothes, worktools, depreciation on car, repairs on car and travelling expenses were not given by them to the appellants, although this information appears on the worksheets. The taxpayers signed the worksheets, but did not go over the figures which were written there by the appellants.

The taxpayer was also requested to sign a blank Federal Income Tax form (Form 1040) at the conclusion of the interview, and was charged a fee of $10. The worksheet was attached to the taxpayer's file, together with the blank but signed Form 1040, and the prior year's return. It is significant that Form 1040's (the "long forms") were used so that deductions could be itemized even though the majority of these "transient" taxpayers earned less than $5,000 a year.

After the interview had been concluded, the information which appeared on the worksheets was copied in pencil on a Form 1040, and the pencilled figures were then copied in ink on the Form 1040

which had been previously signed by the taxpayer. Shoopak, Davis, Reid and Greenberg, all employees of the appellants, testifying as government witnesses, stated that despite the requirement on the returns that the accountant's name be affixed thereto, they were given no instructions to put their names or appellants' names on the face of the return as the accountant who prepared it nor did such names appear on any of the returns.

The returns were then mailed, or delivered in person, according to Herskovitz's instructions, to the mail room of the Bureau of Internal Revenue. All the returns filled out in appellants' offices were filed with the Collector of Internal Revenue at 110 East 45th Street, New York City, irrespective of where the taxpayers lived or worked. In February or March, 1950, Shoopak was instructed by Herskovitz to take the tax returns to the fourth floor mail room and ask for "Mike." He was further instructed to mention the name "Joe Grill" when he gave "Mike" the returns. Shoopak was also given a note by Herskovitz, which was received in evidence without objection. Written in Herskovitz's handwriting, the note contained the following words: "Mike, 5th floor mail room. Jos. Grill, 110 E. 45." When Shoopak arrived at the mail room he handed the returns to "Mike." Reid also delivered returns to the Collector's offices at 110 East 45th Street, according to Herskovitz's instructions. He was told by Herskovitz to deliver them to the mail room and to give them to "Mike." On one occasion, Herskovitz sent Reid to the Collector's office to see "Joe Grill." There was also evidence that a Joe Grill was a deputy collector and auditor of the Third Collection District; and Herskovitz admitted that he was acquainted with said Joe Grill and knew of his connection with the Third Collection District as deputy collector and auditor, although Herskovitz denied knowledge that Joe Grill worked in the mail room there.

There were received in evidence 21 personal income tax returns that had been prepared by appellants as a result of interviews with taxpayers. In every return received in evidence, a refund was requested. But the government audit of 17 of these returns, allowing only legitimate deductions, required a tax liability to be assessed in each case.

All of the taxpayers' worksheets, which were attached to appellants' files, were received in evidence as defense exhibits. An examination of them discloses that not one worksheet has the name of any charitable organization written on it, except possibly the name of the church which a taxpayer attended. The names and amounts on the worksheets were not copied to the Form 1040 until some time after the interview took place, yet every return had at least several names of charitable organizations, as well as a breakdown of the lump sum amount for contributions which appeared on the worksheets. Many names and figures on the return were copied from previous year's returns of the taxpayer.

The fraud practised by appellants is established beyond cavil. The income tax returns disclose excessive deductions for contributions, union dues, medical expenses, taxes, travelling expenses, workclothes, worktools, depreciation on automobiles and losses. Even dependency claims are falsified. These deductions amounted to from 20% to 50% of gross income. In some cases the amounts deducted for sales taxes were so excessive as to show expenditures greater than the entire gross income of the taxpayer for the year. Travelling expenses were taken as a deduction for a switchboard operator, a tailor, a shipping clerk and a baker. Despite the fact that the taxpayer did not use his car for business purposes the returns prepared by appellants included large deductions for depreciation and repairs.

While Herskovitz testified that the figures on the worksheets and returns, in the instances handled by him personally, were given to him by the taxpayers in each case, the jury believed the testimony of the taxpayers that these figures had not been supplied by them.

■ The principal contention of appellants is that, since the conspiracy count was dismissed at the close of the government's case, it was error for the trial court to refuse to strike from the record or to direct the jury to disregard certain testimony of the witnesses Reid, Maddalone, Yankauer, Levine, Bright and Sitkoff received over objection on the representation of government counsel that such testimony was admissible in support of the conspiracy charge.

With respect to much of this testimony it is far from clear that the motions were made in such terms as to make it plain to the trial court that counsel for appellants was making the same points which are now argued before us; but we need not examine that question closely, for it is clear that the testimony offered and received in support of the conspiracy charge was admissible on the substantive charges as well, and that the trial judge committed no error in his rulings.

The substantive counts all referred to the 1949 income tax returns, prepared in early 1950. Some of the challenged testimony, however, dealt also with 1947 and 1948 income tax returns, and included evidence with respect to these returns as well as conversations between each of the appellants and taxpayers during interviews in preparation of these returns. The challenged testimony also dealt with the operations of the office, and included references to "Mike" and "Joe Grill."

This evidence established a consistent pattern of criminal conduct relevant on the issue of appellants' guilty knowledge, intent and purpose. It was independently receivable in support of the substantive counts. None of this evidence was rendered incompetent by the dismissal of the conspiracy count. See Nye & Nissen v. United States, 1948, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919; U. S. v. Rossi, 2 Cir., 1950, 182 F.2d 292, 293; U. S. v. Walker, 2 Cir., 1949, 176 F.2d 564, 566, certiorari denied 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547; U. S. v. Kelley, 2 Cir., 1939, 105 F.2d 912, 916.

■ When the testimony was first offered, there was no occasion for the trial judge to rule that such evidence was inadmissible on the substantive counts, nor did he do so. And even if he had so ruled, there was nothing to prevent him from changing his mind later, after the conspiracy count was dismissed. That the trial judge has a right to change a ruling during the course of a trial is, of course, not open to doubt. Nye & Nissen v. United States, supra.

Thus the effect of the denial of the motions to strike and to direct the jury to disregard was a ruling that the evidence was relevant to the issues arising out of the substantive counts, and that it should remain in the case for the consideration of the jury.

■ This leaves only the further question, on this phase of the case, of whether it was error for the trial judge not to instruct the jury specifically with respect to this testimony, which had been received over objection. But no request was made for any such further instructions.

After all the progress away from technicalities it would be a sorry state of affairs if we reversed this case merely because the trial judge did not explain to the jury that the evidence which was originally offered to support the conspiracy charge was not to be disregarded because the conspiracy charge had been dismissed, but rather should be considered on the question of intent as part of the evidence of what was going on in the appellants' office.

Nor, despite the dismissal of the conspiracy charge, was there any necessity for the trial judge specifically to indicate which part of this evidence was applicable to which defendant. Not only did defendants not make any request for such an instruction but, after the trial judge had charged the jury, there was no request for any amplification thereof, he having said:

"No single defendant can be convicted for the commission of any of these crimes on evidence which is

applicable solely to another defendant or defendants."

It is true that it would not have been error had the trial judge expatiated upon the details of the testimony of these various witnesses and explained to the jury that such evidence had a material bearing on the counts of the indictment remaining for their consideration, with specific identification of the conversations or other evidence admissible only against one or the other of these defendants. However, the rulings as made were in fact more favorable than defendants were entitled to receive. The probability is that the jury, if they gave any consideration to the evidence in question, thought such evidence had gone out of the case when the conspiracy count was dismissed. The jury were not present when the motions were made, and they could have recalled no more than the colloquies which took place at the time such evidence was received in support of the conspiracy count, the fact that the conspiracy count had been dismissed and the instructions relative to the substantive counts, there being no reference whatever in such instructions to the alleged objectable testimony. A full explanation of the nature and relevance of this evidence would have served to emphasize it, and the possible damage to either or both of these defendants may well furnish the explanation for the failure of counsel to present the questions squarely by appropriate requests to charge. At any rate, under the circumstances of this particular case, there is little force in the argument that any prejudice resulted from the rulings as made.

■■ The other alleged errors merit no extended discussion. The cross-examination of Herskovitz as to "Joe Grill" and the check (Exhibit 53) was proper to impeach Herskovitz's credibility. The defendants' Request to Charge No. 33, to limit the applicability of the check, was covered in substance by the court's general language above quoted. There is no duty on the trial court to be more specific. See Blumenthal v. United States, 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154.

■ If defendants desired to suppress Exhibit 45 as having been obtained by an illegal search and seizure, they should have so moved before the trial. Even at the trial they did not object on this ground to Bright's testimony or to the exhibit. It is too late to raise the point now.

■ Finally, it is by no means clear that the taxpayers were accomplices of the appellants. Nor does the failure of the trial court to follow the specific language of defendants' Requests to Charge Nos. 13, 14 and 15 constitute reversible error. See U. S. v. Block, 2 Cir., 1937, 88 F.2d 618, 621; U. S. v. Becker, 2 Cir., 1933, 62 F.2d 1007, 1009.

Affirmed.