**UNITED STATES of America,**
**Appellee,**

v.

**Joseph MANFREDI and Pasquale De-**
**Luca, Appellants.**

**No. 266, Docket 26011.**

United States Court of Appeals
Second Circuit.

Argued Feb. 1, 1960.

Decided March 8, 1960.

Daniel H. Greenberg, New York City (Vincent J. Velella, New York City, on the brief), for appellant, Joseph Manfredi.

Arnold D. Roseman, New York City (Harry Silver, Brooklyn, on the brief), for appellant, DeLuca.

Stephen E. Kaufman, Asst. U. S. Atty., New York City (Thomas D. Edwards and Gideon Cashman, Asst. U. S. Attys., and S. Hazard Gillespie, Jr., U. S. Atty., for the Southern District of New York, New York City, on the brief), for appellee.

Before MEDINA and WATERMAN, Circuit Judges, and MADDEN, Judge, United States Court of Claims.*

MEDINA, Circuit Judge.

Joseph Manfredi and Pasquale De-Luca, together with Victor Euphemia, Joseph DeSerra and Frank Correggio were indicted for conspiracy to violate the narcotics laws. The indictment also contained a number of substantive counts against the various defendants other than Manfredi, who was named only in the conspiracy count. Euphemia, DeSerra and Correggio pleaded guilty before trial but did not testify. At the close of the prosecution's evidence the conspiracy count was dismissed as to DeLuca. Manfredi and DeLuca rested without further proof, and the case went to the jury on the conspiracy count against Manfredi and on a substantive count against De-Luca, charging him with receiving, concealing, selling and facilitating the transportation, concealment and sale of ¼ kilogram of heroin on July 31, 1957. Both were found guilty by the jury. Manfredi was sentenced to seven years and DeLuca to five years imprisonment. Both appeal and they have been released on bail fixed by the trial judge at $35,000 and $15,000 respectively.

As each appellant challenges the sufficiency of the evidence to support his conviction and claims that a verdict of acquittal should have been directed as to him, we shall in due course summarize the proofs and discuss the various points urged as a basis for reversal.

### The Case Against Manfredi

Chronologically the case starts with a sale of 431 grains of heroin by DeSerra to Agent Stephen F. Giorgio of the Bureau of Narcotics on March 4, 1957 on the uptown subway platform of the Lexington Avenue subway at 28th Street and Fourth Avenue in New York City. The scene of actual deliveries of

* Sitting by designation.

heroin will shift to an apartment occupied by the Correggios at 1900 Longfellow Avenue in the Bronx and to the neighborhood of 86th Street and Lexington Avenue. There was a final delivery of ¼ kilo of heroin by Euphemia to Anthony Mangiaracina, another Agent employed by the Bureau of Narcotics, for $2500 in an automobile in front of the Ten Pin Tavern on Westchester Avenue in the Bronx on July 31, 1957, but doubtless in a commendable endeavor to keep the proofs against the two defendants separate, and for the protection of DeLuca after the dismissal of the conspiracy count against him, Judge Levet instructed the jury that the evidence of the July 31, 1957 transaction could only be considered against DeLuca and that the rest of the evidence could be considered against Manfredi alone, despite the fact that, assuming a finding of the existence of a conspiracy and Manfredi's participation, the jury would have been entitled to consider against Manfredi the testimony concerning the July 31, 1957 transaction.

Manfredi or his wife owned a combination candy store and luncheonette on East 108th Street, between First and Second Avenues. The direct proof of Manfredi's participation in the conspiracy relates to what a considerable number of government agents saw him do, either in the candy store or in front of it or driving in a new 1957 Oldsmobile with New Jersey plates, or walking in the streets in the vicinity of the candy store. The relationship between the various sales of large quantities of heroin and Manfredi was a matter of inference to be made after piecing together the testimony of various agents, who dealt with or watched DeSerra and Euphemia, with the testimony of other agents, located either on the roof of a building across the street from the candy store or on foot or in automobiles, who kept Manfredi under surveillance. When once the sequence of dates is understood and the coordination of the testimony of the various agents is made, the application of the law to the facts as the jury

must be assumed to have found them is simplicity itself. Accordingly, we shall review the evidence of Manfredi's participation solely with the view of determining whether, disregarding the declarations and acts of DeSerra and Euphemia, there was sufficient basis for a finding by the jury that there was a conspiracy in the traffic of narcotics and that Manfredi knowingly participated in this conspiracy. The direct proof of the sales and purchases of narcotics was obviously competent and it was relevant and necessary to establish the existence of the conspiracy.

In a carefully prepared, thorough and lucid charge Judge Levet instructed the jury that Manfredi's "connection with the conspiracy cannot be established by the acts or declarations of other defendants in his absence," that it "must be established by evidence as to his own conduct, what he himself said or did"; and that only after finding that a conspiracy existed and that Manfredi was a knowing participant therein could the jury consider acts and statements of other members of the conspiracy in his absence.

The case is further simplified by the fact that no testimony was given by the other defendants who had pleaded guilty. And the number of sales of substantial quantities of heroin for large sums of money by DeSerra and Euphemia could scarcely leave any doubt in the mind of anyone familiar with this record that a widespread conspiracy in the traffic in narcotics existed. The real question was whether there was proof of Manfredi's participation, which his counsel vigorously denied.

Immediately after the sale of heroin to Giorgio on March 4, 1957 DeSerra and Papalardo went in a taxi to Leo's bar at 109th Street and Second Avenue where they remained for a few minutes. DeSerra then walked east on 108th Street, Manfredi came along in the Oldsmobile, passed DeSerra, parked the car and both came back and entered the candy store. Agent Daniel D. Moynihan saw them from 25 feet away. They talk-

ed together but neither spoke to any of the six other persons in the store. If money passed Moynihan did not see it, as DeSerra was facing in the other direction toward Manfredi.

The next sale of heroin by DeSerra to Giorgio was on March 14, 1957. Again he went directly to Leo's bar and from there to 108th Street, where Manfredi was standing on the steps in front of the candy store. Manfredi went into the store followed by DeSerra and they conversed. This time DeSerra was facing Moynihan who saw him give money to Manfredi, who put the money in his pocket. DeSerra left without speaking to anyone else. Between March 4 and March 14 DeSerra and Manfredi were frequently seen in the neighborhood of the candy store but did not speak to one another.

On March 21, 1957 there was another sale of heroin by DeSerra to Giorgio, this time double the previous quantity and he received $750. DeSerra went to 109th Street and Second Avenue in a cab, started to walk east toward a social club near the corner, then turned back, walked south to 108th Street, then east to the candy store. He kept walking around until he was joined by Manfredi. When inside the candy store they saw Agent William Wong coming into the store and they left. As they walked up the street together Moynihan saw DeSerra hand money to Manfredi, who counted the money and put it in his pocket.

On March 28, 1957 there were two sales of heroin by different men in widely separated parts of the city and each promptly returned to Manfredi and handed him money. DeSerra made another sale to Giorgio in the subway at 7:15 P. M. and shortly after 8 o'clock Agent Edward T. Coyne saw DeSerra arrive at the candy store where Manfredi was standing outside. They spoke for a time and as Coyne walked past the candy store Manfredi was counting money which he placed in his pocket.

On the same day, March 28, Agent Anthony Mangiaracina made a purchase of heroin from Euphemia and the delivery and payment therefor were made in front of the apartment house where the Correggios lived at 1900 Longfellow Avenue in the Bronx. Mangiaracina and Euphemia had met in the street at 86th Street and Lexington Avenue and, after picking up Correggio in a candy store at 117th Street between Second and Third Avenues, Euphemia drove the three of them up to the Bronx in an Oldsmobile. Immediately after the delivery of the heroin and after Mangiaracina walked off in the direction of the subway, Agent Leonard Schrier in his car followed Euphemia in the Oldsmobile to the gas station at 108th Street and First Avenue and Euphemia parked his car. Euphemia stood for about five minutes in front of the funeral parlor on 108th Street and after about five minutes Manfredi came along. Schrier saw Euphemia counting money which he handed to Manfredi and Manfredi put it in his pocket without counting it. Euphemia then got back in the Oldsmobile and drove away.

Against the background of furtive conduct that we have thought it not necessary further to describe in detail, and having in mind that Manfredi when asked by the government agents in DeSerra's presence denied he knew DeSerra, we think the evidence was more than sufficient to warrant a finding that Manfredi knowingly participated in the conspiracy. Thus the jury was justified in considering the other testimony concerning the acts and declarations of DeSerra, Euphemia and Correggio in furtherance of the conspiracy, and also the testimony of Mangiaracina concerning the long drawn out preliminaries leading up to the large 1/4 kilo transaction of July 31, 1957, as well as the conduct of Euphemia and DeLuca on that day. The instruction to the jury that the testimony relating to the sale of 1/4 kilo of heroin on July 31, 1957 "is not to be considered in any respect with regard to the defendant Manfredi" was more favorable to Manfredi than the law required. We shall return to this subject when discussing DeLuca's points.

As is usual in conspiracy cases we are asked to hold the evidence insufficient on the basis of certain comments in well known cases that are cited to us again and again. We refer to Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Krulewitch v. United States, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, and especially Panci v. United States, 5 Cir., 1958, 256 F.2d 308. There are many others cited in the briefs. But the fact situations in these cases do not even remotely resemble that disclosed by the present record. It is idle to talk of convictions based on mere suspicion or guilt by association or the circumstance that there is here no proof that marked bills were used in making payment for the deliveries of narcotics and no marked bills were proved to have been in Manfredi's possession. This is not that kind of a case; and we find more than mere suspicion and association with evil characters. Moreover, while the result in Panci seems sound enough, we think it time to say that we do not wholly approve of Panci. See United States v. Brown, 2 Cir., 1956, 236 F.2d 403. See also 55 Col.L.Rev. 549 (1955).

While the evidence of Manfredi's participation in the conspiracy was circumstantial, we think it clearly supports the verdict. The jury evidently believed the testimony of the government agents and drew such inferences from the facts established by such testimony as it was within their exclusive province to draw. Manfredi had a fair trial and the judgment against him is affirmed.

### The Case Against DeLuca

Throughout the trial at the very proper insistence of counsel for Manfredi and DeLuca evidence of acts and declarations of alleged co-conspirators, chiefly DeSerra and Euphemia, were received subject to connection and a motion to strike. After the trial judge had dismissed the conspiracy case against DeLuca and had ruled that he would permit the jury to pass upon the conspiracy charge against Manfredi and to pass upon the substantive charge against DeLuca in connection with the ¼ kilo sale on July 31, 1957, the time arrived for counsel to make appropriate motions to strike or for specific instructions to the jury with respect to the evidence that the jury was entitled to consider against each defendant. The trial judge said:

"Now, you may want to make some motions with respect to the testimony and I would like you to be as specific as possible about that."

Before we examine the colloquy that followed, and the ruling that was affirmatively approved by trial counsel for both Manfredi and DeLuca, it will be helpful to an understanding of DeLuca's claim that he did not have a fair trial if we briefly set forth DeLuca's contentions:

(1) That the testimony received in support of the conspiracy count so poisoned the atmosphere of the trial as to prejudice DeLuca and that nothing the trial judge could have said or done could have prevented the jury from considering the testimony, especially that relating to Euphemia's declarations concerning Manfredi, in its deliberations on the subject of the guilt or innocence of DeLuca.

(2) That the pre-trial motion for a severance should have been granted.

(3) That part of the testimony of Mangiaracina, to the effect that on the way to the subway to go to the Ten Pin Tavern on July 31, 1957 he asked Euphemia who DeLuca was, and Euphemia replied "He is one of Manfredi's runners," was part of the testimony permitted to be considered by the jury against DeLuca. As this point was not presented to the trial judge we assume that this argument is addressed, as are others on behalf of DeLuca, to our inherent powers under Rule 52(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.

(4) That the Bill of Particulars was insufficient and misleading.

(5) That the instructions to the jury were "formidably one-sided" and contained "not a word of presentation of DeLuca's defense."

(6) That the evidence against DeLuca was wholly insufficient to support a conviction.

## I

■■ It is now settled law in this Circuit that where several defendants are indicted jointly, all charged with conspiracy and one or more charged with various substantive offenses in the same general subject matter, and the conspiracy count is dismissed as against one or more of the defendants at the close of the prosecution's evidence, instructions to the jury with respect to the evidence to be considered by them against a particular defendant or defendants will be deemed a sufficient safeguard of the rights of such defendant or defendants "in the absence of bad faith on the part of the government in bringing the conspiracy count," or some special circumstance of an extraordinary and unusual character. See United States v. Schaffer, 2 Cir., 1959, 266 F.2d 435. The theory behind this ruling is that: "It is fundamental to the jury system that they will be presumed to follow the court's charge and to limit their consideration to the evidence which may be properly applied against each defendant where more than one defendant is on trial." United States v. DeFillo, 2 Cir., 1958, 257 F.2d 835, 839, and cases cited.

Where it is claimed that the conspiracy charge against a particular defendant was made in bad faith or that some other extraordinary circumstance makes it impossible to proceed against such defendant without prejudice to his rights, the proper procedure is to move for a mistrial as to such defendant. No such motion was made by DeLuca in this case. Moreover, we find in the record no basis whatever for any contention that there was bad faith of any kind on the part of the prosecution.

■ We have examined the record before Judge Dimock on the motion for a severance and nothing therein discloses any abuse of discretion.

## II

■ DeLuca's other points on the subject of a fair trial are so interrelated that it will be convenient to treat them together. As mentioned above, after the dismissal of the conspiracy count against DeLuca, the trial judge suggested that motions relative to the evidence should be made "as specific as possible." The testimony of Mangiaracina concerning the conversation with Euphemia in which Euphemia had said DeLuca was one of Manfredi's runners had been received subject to a motion to strike. No such motion was made nor did counsel for either Manfredi or DeLuca pursue the trial court's suggestion relative to motions of a specific character, or motions of any character at all. Instead, a colloquy ensued relative to "the testimony that relates to DeLuca's substantive count" and the prosecutor informed the court that this was testimony by Mangiaracina and Bennett, also a very small part of the testimony of Schrier. Accordingly, and in what we think was clearly an endeavor to protect DeLuca's rights and eliminate possible prejudice to him arising out of the testimony against Manfredi on the conspiracy charge, the trial judge ruled "on behalf of DeLuca":

"I will instruct the jury to disregard all the testimony except Bennett's, and Mangiaracina's testimony which related to the episode itself, and Schrier's testimony relating to the episode itself."

Counsel for DeLuca made no objection to this. But there was more to follow. Judge Levet, in what might perhaps have been an excess of caution, decided further to protect DeLuca's right by instructing the jury that, just as the testimony against Manfredi was not to be considered against DeLuca so also "by the same token any testimony against DeLuca is to be disregarded as against Manfredi." The court continued:

"That is in accord, I assume, with your position. Is that correct?

"Mr. Kove: Yes, sir.

"Mr. Roseman: Yes, sir."

It is apparent, we think, that the trial judge intended by this ruling to exclude from the consideration of the jury the conversation related by Mangiaracina to

the effect that Euphemia said DeLuca was one of Manfredi's runners. And we believe the later instructions, in almost the same words, were understood by the jury to eliminate from their consideration against DeLuca all the incidental matter in the nature of declarations of Euphemia and other alleged co-conspirators. This particular conversation had obviously been received solely for its bearing on the conspiracy count and that had now been dismissed as to DeLuca.

But, if there were any doubt about the meaning of the instruction thus submitted to counsel for their approval, in the absence of the jury, why did not counsel for DeLuca raise the point by specific motion? We think the reason is plain enough; the instruction proposed was so favorable both to Manfredi and to DeLuca that counsel for each immediately gave his assent. From Manfredi's standpoint the jury was to be instructed to disregard some of the most damaging testimony in the case against him, that relating to the sale of ¼ kilo of heroin for $2500 on July 31, 1957. If the law were to be strictly applied the jury were entitled to consider against Manfredi the declaration of Euphemia that DeLuca was one of Manfredi's runners, once the jury had first concluded that a conspiracy existed and Manfredi was a member of it. The elimination as to Manfredi of all the testimony concerning what occurred on July 31 was a distinct advantage. From DeLuca's standpoint the cleavage between the two defendants was now complete and his counsel had only to deal with the proof of the sale and delivery of the ¼ kilo of heroin on July 31, 1957.

As a further indication that the point now under discussion wholly lacks substance it is worthy of comment that no request for instructions was made on the subject of Euphemia's declaration; that the summary of the evidence to be considered against DeLuca made by the trial judge in his instructions to the jury made no reference to this declaration; and that at the conclusion of the charge no exception was noted on this point and

no request for further instructions submitted. We think the jury gave this declaration no consideration whatever in their deliberations on the subject of DeLuca's guilt or innocence and that, in any event, the point was waived.

While on this subject we may as well dispose of the claim that the charge was "formidably one-sided" and gave a long recital of the evidence against DeLuca without "a word of presentation of DeLuca's defense." This contention is most unfair to a conscientious and careful judge who was doing everything in his power to avoid prejudice to DeLuca from the evidence left in the case against Manfredi on the conspiracy count. The summary of the testimony of Mangiaracina and Bennett and Schrier on the subject of "the July 31st episode," with quotations from the testimony of Mangiaracina and Bennett, was by way of explanation of the testimony the jury were to consider against DeLuca, to make sure that as against DeLuca the jury would give no consideration to the other testimony in the case. Judge Levet thought it best to be specific about what he meant by his reference to "the testimony of Mangiaracina and Bennett, and part of Schrier with respect to the episode of July 31st"; and when he had concluded his summary of the evidence against DeLuca, the trial judge added, "I think that is all the testimony on that." Moreover, counsel for DeLuca in his summation had said: "if there is any dispute as to what was said, please have Judge Levet ask the court reporter to read that particular testimony that was offered against the defendant DeLuca."

DeLuca did not testify, nor did he call any witnesses. We are at a loss to determine what was the so-called defense the trial judge is supposed to have been under a duty to describe to the jury. As to credibility and the inferences to be drawn from the testimony, the instructions were unexceptionable and also were to the effect that these were matters exclusively within the function of the jury to decide. The suggestion in counsel's brief that the ¼ kilo of heroin had been

"planted" in DeLuca's car had been argued in summation and we think it was clearly within the discretion of the trial judge to mention this argument or to say nothing about it.

### III

■ What was the testimony of Mangiaracina, Bennett and Schrier concerning the episode of July 31? Was it sufficient to make out a case against DeLuca on the substantive charge of receiving, selling, concealing, buying, or in any manner facilitating the transportation, concealment or sale of a narcotic drug in violation of 21 U.S.C.A. §§ 173 and 174?

Schrier merely testified that he saw Mangiaracina and Euphemia together at 86th Street and Lexington Avenue on July 31, 1957 and that at about 8 o'clock in the evening they went into a drug store and stayed there about five minutes.

Mangiaracina testified that he met Euphemia at that time and place, and told Euphemia he had enough money to buy ¼ kilo of heroin if he could deliver it that evening. They went into a drug store and Euphemia entered a phone booth, leaving the door open. Mangiaracina noticed that Euphemia dialed TA 2–9192 which was the telephone number of the Ten Pin Tavern on Westchester Avenue in the Bronx. Mangiaracina heard Euphemia address the person on the other end of the telephone as Scarpa and Euphemia said "Ten minutes, give us half an hour to get up there." DeLuca admitted later to one of the agents that he was known as Scarpa. At some places in the transcript this name is spelled Scop and, evidently as a stenographic error Starpa. DeLuca was the bartender at the Ten Pin Tavern.

Mangiaracina and Euphemia then took the subway to Buhre Avenue station in the Bronx. On Westchester Avenue Euphemia told Mangiaracina to wait and he went into the Tavern. A few minutes later Euphemia came out, Mangiaracina

joined him and they walked north up Westchester Avenue. Euphemia told him the heroin was in the 1956 black Oldsmobile standing in front of the Tavern. So they walked back to the Tavern and Euphemia said: "When we get in, open all the windows. In case we are chased we will throw the package out of the car." Euphemia then unlocked the car and they both got in. Euphemia said, "The package is in the glove compartment, take it out and hold it in your lap." Mangiaracina did so and handed Euphemia $2500. Euphemia then drove Mangiaracina to the subway station.

In the meantime, Agent Lee Bennett had followed Mangiaracina and Euphemia. He saw them walking north on Westchester Avenue, passed them walking in the opposite direction and, as he reached the Ten Pin Tavern he saw DeLuca outside the Tavern, "I saw him take two or three steps away from the door, peering north in the direction that Euphemia and Agent Mangiaracina had taken." He noted the license number of the 1956 black Oldsmobile, 2C7252, and it was registered in DeLuca's name as owner. Bennett later was around the neighborhood on many occasions and saw DeLuca driving this car.

We think this evidence was sufficient to take the substantive count against De-Luca to the jury.

■ After the evidence was closed counsel for DeLuca raised the point that the Bill of Particulars stated that De-Luca's acts of receiving, concealing, selling and facilitating the transportation, concealment and sale of narcotics occurred "within and in front of" the Ten Pin Tavern and made no mention of the automobile. We think it clear that no prejudice resulted from this alleged omission to give more ample details of what the government expected to prove. Moreover, as held by Judge Levet, the point was raised too late and had been waived.

Affirmed.