**UNITED STATES of America,**
Appellee,

v.

**Max Manny ELGISSER and Louis Glad-stein, Appellants.**

**No. 313, Docket 28566.**

United States Court of Appeals
Second Circuit.

Argued Feb. 11, 1964.

Decided July 7, 1964.

Certiorari Denied Oct. 19, 1964.
See 85 S.Ct. 148, 151.

Robert M. Morgenthau, U. S. Atty., Southern District of New York (Peter Fleming, Jr., Charles A. Stillman, Asst. U. S. Attys., of counsel), for appellee.

Daniel H. Greenberg, New York City, for appellant Elgisser.

Bobick & Deutsch, New York City (Arthur Addess, New York City, of counsel), for appellant Gladstein.

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge.

In the first count of an indictment Louis Gladstein and Max Manny Elgisser, along with William James Pitts, James Offie Cogdell, and Edward James Manin, were charged with having conspired, on and after December 1, 1961, to violate Title 18, Section 659 of the United States Code. That section makes it a crime either to steal from an interstate facility goods moving in interstate or foreign commerce, or to receive or possess such goods knowing them to be stolen.[1] A second count charged Pitts and Manin with the substantive offense of knowingly possessing such goods on December 10, 1961; and a third count charged Elgisser and Gladstein with having committed the substantive offense of knowingly possessing such goods on December 11, 1961. Pitts and Cogdell pleaded guilty before they were brought to trial, and both testified for the Government at the joint trial of Gladstein, Elgisser, and Manin, held in the United States District Court for the Southern District of New York before Judge Thomas F. Murphy and a jury. At the close of the Government's evidence the conspiracy count was dismissed as to all of the defendants, and, none of the defendants desiring to offer further proof, the case then went to the jury on the two substantive counts that alleged knowing possession of stolen goods. The jury found defendant Manin guilty on the second count of the indictment and defendants Gladstein and Elgisser guilty on the third count. The judgments of conviction were entered accordingly.

Defendants Gladstein and Elgisser have appealed from their convictions. Defendant Gladstein claims (1) that the trial court erred in failing to give a charge which properly instructed the jury as to the limited use which could be made of certain evidence, out-of-court statements by the various defendants, which had been admitted subject to connection under the conspiracy count without limitation as to purpose; and (2) that there was insufficient evidence to support his conviction. Defendant Elgisser joins defendant Gladstein in the latter's first claim of error, and he argues further that the court erred in admitting real evidence which had allegedly been seized illegally by the federal agents who arrested him and Gladstein. We find all three claims of error to be without merit and accordingly affirm both convictions.

The Government's evidence consisted largely of the testimony of Pitts and Cogdell and established the following: On Wednesday, December 6, 1961, Manin approached Pitts in a New York gas station where Pitts worked, spoke to him about some dresses which Manin had in his possession, and Pitts offered to try to sell them for Manin. Later that day Pitts contacted Cogdell, who informed Pitts that he would take him to a man that evening who would buy all the dresses Pitts could get. That night the trio

---

1. The statute provides in pertinent part:
   "Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any railroad car, wagon, motortruck, or other vehicle, or from any station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight or express; or

"Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen; * * *.

\*   \*   \*   \*   \*

"Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

\*   \*   \*   \*   \*

met defendant Elgisser and Elgisser purchased twenty dresses from Manin. Either Manin or Pitts also told Elgisser that they could obtain a "load of dresses" but would have difficulty in securing a truck to transport them. Elgisser indicated that he could help them obtain the needed vehicle.

The following day, Thursday, Manin, Cogdell and Pitts drove to a butcher shop owned by Elgisser; and, after Cogdell had talked to Elgisser and had secured the necessary directions, the three drove on to defendant Gladstein's wrecking lot on Boston Post Road in the Bronx. All three went inside, and Cogdell asked to see the owner of the lot. Gladstein then appeared and asked Cogdell, "Are you the fellow?" Cogdell replied in the affirmative, and Gladstein, having just picked up a telephone which had begun to ring, said into it, "Yes, they're here now." Gladstein and his visitors then left the office of the wrecking lot and got into a car which was sitting outside. Gladstein asked about "the load of dresses" which Elgisser had told him about, indicated that he was upset by the fact that Elgisser was involved with the matter, and said that "being as you know him already, there's already been a deal, let it go at that." After discussing with the three their need for a truck, Gladstein showed them a Reo truck with a red cab and blue body which he said he could have ready for them by six o'clock the next evening. Pursuant to this arrangement, the following evening, Friday, December 8, Manin, Pitts and Cogdell returned to Gladstein's wrecking lot for the truck. Gladstein said that the truck ran well, he provided license plates for it, admonished the three to "be careful," and furnished Cogdell with a telephone number to call when the truck was returned to New York. Pitts, Cogdell and Manin then left the wrecking lot in the truck and later that evening Pitts and Manin drove it to Albany.

In Albany, Pitts and Manin failed to make contact with the party from whom they were to obtain the dresses, and they decided to stay in that city over-night. The following evening, Saturday, December 9, Pitts and Manin entered an Albany freight terminal owned by Crowe and Company, Inc., an interstate trucking firm, and took away various cartons containing children's rubber boots, phonograph records and clothing. The two then returned to New York with the load of cartons, arriving back in the city on Sunday morning, December 10. They phoned Cogdell to tell him that they had returned and then met him at the gas station where Pitts worked. Cogdell then called the telephone number which Gladstein had given him; and, pursuant to instructions which he thereupon received from a "Mike" on the other end of the line he, assisted by Pitts and Manin, took the loaded truck to a truck stop at Baychester Avenue and Boston Post Road in the Bronx and left it there.

On Monday, December 11, at about 4:00 P.M., Cogdell stopped at Gladstein's wrecking lot and asked for Gladstein. Gladstein appeared and told him, "California's [Manin's] been here and collected the money, I gave him $500 and—I gave him $500—well, that's the best I could do." Later that day, between about 5:00 and 5:30 P.M., under circumstances to be described in detail later in this opinion, FBI agents who had been keeping the Reo truck under surveillance arrested Gladstein and Elgisser in the Bronx. Immediately prior to the arrests, Elgisser had been in the body of the truck and Gladstein had been driving it. A search of the truck revealed that it contained miscellaneous goods, including some of the cartons of rubber boots and two of the cartons of phonograph records which had been stolen from the Crowe and Company Albany terminal. Gladstein, at the time of arrest, told the agents that the truck had been left with him to sell and that he was moving it off the street to an unidentified lot farther up the road. When directed by the agents to drive the truck to his own lot, which, interestingly enough, was only one hundred feet away, Gladstein did so and had no difficulty parking the truck there. Gladstein consented shortly thereafter to

a search by FBI agents of a Bronx store owned by him. The searchers there found additional cartons of rubber boots, one carton of phonograph records, and one carton of clothes, all of which had been part of the load stolen from the Crowe and Company terminal.

At the close of the Government's case Judge Murphy dismissed the conspiracy count of the indictment for failure of proof. If the Government had succeeded in establishing the existence of the alleged conspiracy, the jury would have been permitted to consider, under the established exception to the hearsay rule that makes admissible against every member of a conspiracy the declarations of any one conspirator which have been made in furtherance of the conspiracy, unsworn out-of-court statements made by any of the defendants as evidence against every one of them. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790 (1949); United States v. Mishkin, 317 F.2d 634 (2 Cir.), cert. denied, 375 U.S. 827, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963); United States v. Lev, 276 F.2d 605 (2 Cir.), cert. denied, 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960). However, a failure to establish the existence of a conspiracy would render inadmissible for this broad purpose the out-of-court declarations which, subject to the Government's establishing the alleged conspiracy, had already been permitted to come into evidence against the defendants generally. On the other hand, there being no indication of bad faith on the part of the Government in bringing the conspiracy count, or of special circumstances requiring a different procedure, the defendants have no valid objection if the use of the evidence introduced against them subject to proof of a conspiracy were properly so limited. United States v. Manfredi, 275 F.2d 588 (2d Cir.), cert denied, 363 U.S. 828, 80 S.Ct. 1598, 4 L.Ed.2d 1523 (1960); United States v. Schaffer, 266 F.2d 435 (2 Cir. 1959), aff'd, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960). This was done here and the limiting instructions which Judge Murphy gave to the jury adequately protected these defendants.

After the close of the Government's case and the dismissal of the conspiracy count, and before the summations and the charge to the jury, Judge Murphy informed the jury that the conspiracy count had been dismissed and instructed the jurors to "confine your thinking to the evidence that was received that related to a specific defendant as distinguished from some conversations that were had in his absence." During his charge Judge Murphy devoted considerable attention to the matter of the limited use to which the jury could put the codefendant declarations:

"Secondly, there was considerable testimony which I permitted in evidence on the representation that the government was going to connect it later on. This related generally to the conspiracy count, which is no longer in the case, and to a large extent related to conversations that Mr. Pitts had with Manin, sometimes called California, and conversations with Mr. Cogdell and also related to conversations that Cogdell had with Pitts and Manin.

"If the government had proved the conspiracy, according to the way I understand the law, the conversations by conspirators could be admissible against all conspirators even though they were not present. But since I have dismissed the conspiracy you must disregard that testimony and consider only the testimony that relates to specific defendants and only those conversations had with a specific defendant and in that defendant's presence. Now, this does not exclude any conversations that Mr. Pitts or Mr. Cogdell made with the defendant Elgisser as long as you remember that it can be considered by you only with regard to the defendant Elgisser and not relating to Gladstein. It also does not exclude any conversations Pitts or Cogdell had with the

defendant Gladstein, but you must consider that such conversations are to be considered by you only with regard to Gladstein and not with regard to Elgisser."

■ These interim instructions, and the charge of the trial court adequately apprised the jury that it was not to consider the unsworn out-of-court statements of any one defendant as evidence against any other defendant.[2] See United States v. Manfredi, supra, 275 F.2d at 593–594; United States v. Schafer, supra, 266 F.2d at 443; United States v. DeFillo, 257 F.2d 835, 839 (2 Cir. 1958), cert. denied, 359 U.S. 915, 79 S.Ct. 591, 3 L.Ed.2d 577 (1959); United States v. Herskovitz, 209 F.2d 881, 885–886 (2 Cir. 1954). In fact, the instructions and charge may well be viewed as having gone beyond this, for, literally read, they even barred as evidence against the defendants all statements by Pitts and Cogdell which were made out of the defendants' presence. Of course, since Pitts and Cogdell testified in court as to their own prior declarations the hearsay rule could not possibly have operated to render these statements inadmissible in any way; and, as long as the requirements of relevancy and materiality were met, the statements were admissible against any of the defendants. See United States v. Mishkin, supra, 317 F.2d at 637.

■ Contrary to defendant Gladstein's second claim of error, there was sufficient evidence to establish that his possession of the stolen goods had been with the requisite knowledge that they had been stolen. Two days after the goods had been stolen Gladstein was apprehended driving his own truck, the one which had been used in the theft, which contained most of the stolen goods. The rest of the goods were found, shortly after Gladstein was taken into custody, in a store owned by him. At trial Gladstein offered no explanation for his pos-

session. This in itself was sufficient to entitle a jury to draw the permissible inference that Gladstein had possessed the goods knowing them to have been stolen. United States v. Minieri, 303 F.2d 550 (2 Cir.), cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962); United States v. Lefkowitz, 284 F.2d 310 (2 Cir. 1960). Moreover, there was considerable evidence other than unexplained possession by Gladstein tending to establish guilty knowledge on his part. Gladstein's statements to Cogdell and Pitts, made when arrangements were being worked out for the use of Gladstein's truck, tended to establish that Gladstein realized that the vehicle was going to return with stolen goods, as did the warning to "be careful" which he issued when he turned the truck over to them the following day. Finally, the use of the telephone number given Cogdell by Gladstein to receive instructions as to where to park the truck loaded with the stolen goods, as well as Gladstein's statement to Cogdell that he had paid Manin $500 and "that's the best I could do," constituted additional evidence on this issue damaging to Gladstein.

We come now to defendant Elgisser's claim that evidence seized at the time of his arrest without a warrant, consisting of the stolen goods then in his and Gladstein's possession, should have been suppressed and not permitted to be introduced against him at trial. The testimony adduced at the hearing on the motion to suppress established the following: On the morning of Monday, December 11, 1961, the New York office of the Federal Bureau of Investigation received information from a confidential informant who, according to agents of that office, had furnished reliable information in the past, that a Reo truck with a red cab and a blue body containing rubber boots and phonograph records which had been stolen in upstate New York, was parked in the vicinity of the Boston Post Road in the Bronx. Agent Griffin P. Martin

---

2. Though defense counsel objected to the charge it should be noted that counsel gave the court no written requests to charge despite a specific invitation by the trial judge to do so.

thereafter caused the upstate FBI office in Albany to be contacted and learned from that office that, over the previous weekend, the Crowe and Company trucking terminal in Albany had been burglarized. The burglars were reported to have stolen cartons of children's rubber boots that were in interstate commerce. An attempt was then made to locate the Reo truck, and at 1:00 P.M. that day the truck was located on Cruger Avenue, just off the Boston Post Road, in the Bronx. The truck was put under surveillance by agent Martin, who was relieved later that day by agents Beardsley, Brown, Scannell and Miller.

Agents Beardsley and Miller testified that at the time they relieved agent Martin they had been advised that the truck contained a quantity of merchandise, including cartons of children's rubber boots, which had been stolen the previous weekend from upstate New York, and that the Albany FBI office had verified a theft of interstate merchandise of that type from an upstate New York terminal the past weekend. Agent Miller testified that he had been told by agent Martin that the information as to the truck's contents had come from a confidential informer of high reliability. Agent Martin testified that he did not know who the informer was, but nevertheless maintained that he knew that the informer was reliable. The four agents relieving agent Martin split up into two surveillant teams, with agents Miller and Scannell taking up a position in a parked car some distance behind the truck on Cruger Avenue, and with agents Brown and Beardsley maintaining a mobile surveillance of the truck from another car.

At about 5:20 P.M. agents Brown and Beardsley observed a man dressed in a white smock, who they later determined was defendant Elgisser, open the body of the truck and get in. They radioed this information to agents Miller and Scannell, who approached the truck in their car. Agent Miller got out of his car and went over to the truck, knocked on the door to its body, and called out "FBI." Elgisser opened the truck door and at once agent Miller was able to observe that Elgisser was holding in one hand a pair of children's rubber boots and in the other a flashlight. He also observed children's rubber boots on the floor at Elgisser's feet, and he could also see, farther back in the body of the truck, other cartons, one of which had children's rubber boots sticking out of it.

Agents Miller and Scannell then took Elgisser into custody, and by radio informed agents Brown and Beardsley of the arrest and of what agent Miller had observed in the truck. A few minutes later the truck pulled out. Agents Brown and Beardsley followed it for about a block, waved it over to the curb, and arrested the driver, defendant Gladstein. The body of the truck was opened and a quick search revealed that it contained children's rubber boots. These were seized and later introduced in evidence against the defendants, along with phonograph records also found in the truck. These were shown to be part of the loot stolen in the upstate burglary.

The admissibility of the evidence which was seized depends, of course, upon the legality of the search which was made of the truck, and this in turn depends upon whether the arrests, made without warrants, were legal. Agents of the FBI have statutory authority to make felony arrests without a warrant for offenses "committed in their presence," or where they have "reasonable grounds to believe that the person to be arrested has committed or is committing" a felony. 18 U.S.C. § 3052. The "reasonable grounds" requirement of the statute is equivalent to the Fourth Amendment's requirement that arrests may be made only upon "probable cause." Wong Sun v. United States, 371 U.S. 471, 478, fn. 6, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963); Henry v. United States, 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed. 2d 134 (1959). What constitutes "reasonableness" or "probable cause" must depend upon the specific facts of each case, United States v. Williams, 336 F.2d 183 (2 Cir. May 15, 1964), (per curiam); United States v. Wai Lau, 329 F.2d 310

(2 Cir. 1964) (per curiam), but it is clear that in every case the Government has the burden of establishing that the probable cause requirement has been met. Wong Sun v. United States, supra; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); United States v. Rivera, 321 F.2d 704 (2 Cir. 1963). We think that the totality of the circumstances in this case warranted the court below in finding that the Government had sustained its burden, and had established that information available to the arresting agents at the time of the arrests was such as to "warrant a man of reasonable caution in the belief" that a felony had been and was being committed. Carroll v. United States, supra, 267 U.S. at 162, 45 S.Ct. at 288.

■ At the time agents Miller and Scannell arrested Elgisser, they had been advised that a "reliable" confidential informant had told the FBI that the Reo truck, a Reo truck with a red cab and a blue body, they had been assigned to watch contained goods which had been stolen in upstate New York. If this had been the only information available to the arresting agents at the time of arrest we would be reluctant to find that the Government had met its burden of establishing that this arrest was lawful. Only information from a reliable informer will suffice to establish probable cause, see Draper v. United States, 358 U.S. 387, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and for this reason an accusation by an informer cannot itself furnish probable cause where arresting agents have "no basis in experience for confidence in the reliability" of the informer's information. Wong Sun v. United States, supra, 371 U.S. at 480, 83 S.Ct. 407, 413. Moreover, where information received from an informer is essential to the establishment of probable cause, his name may not be withheld from the judge or magistrate whose duty it is to determine whether the probable cause requirement has been met. United States v. Santiago, 327 F.2d 573 (2 Cir. 1964); United States v. Robinson, 325 F.2d 391 (2 Cir. 1963). As we said in the Robinson case, deci-

sions as to the reliability of informers who have been furnished information used to make an arrest "should not be left in the hands of law enforcement officers who may later be called upon to justify their action; they may safely be left only in the hands of some impartial judge or magistrate." 325 F.2d at 393.

■ In this case the only evidence on the issue of the previous reliability of the informer was the opinion of FBI agents that the informer was reliable. Agent Martin, who, it appears from the record, was the testifying agent who knew the most about the informant, stated that he believed the informant to be reliable but admitted that he did not know who the informer was. It would seem that if the burden of establishing probable cause is in truth to be placed on the Government in these cases, and if the existence or absence of probable cause is in fact to be determined by an impartial judge or magistrate, then, where the existence of probable cause depends solely upon the reliability of an informer, the Government must be required to do more than establish that, in the opinion of the agents directing or participating in the arrest, the informer was reliable, or that in the agents' opinion information furnished by the informer in the past had been found to be reliable, whatever that may mean to them. The Government, in order to carry its burden of proof on the issue of probable cause, at least ought to be required to name the informer and to indicate what information the informer has furnished in the past, and with what results. Otherwise, the finding of the existence or absence of probable cause in a case where the reliability of the informer is at issue will not depend upon the considered judgment of an impartial judge or magistrate, but upon the judgment of law enforcement officers involved in the arrest.

■ Here, however, the arresting agents, at the time of arrest, had before them more than a tip that the truck on which they had been directed to keep a watch contained stolen goods. The Albany office of the FBI had told the New

York office that an upstate terminal had been burglarized and that goods of the type reported by the informer to be in the truck had been stolen. Thus, the correctness of the informer's tip had to some extent been confirmed through corroboration. See United States v. Boston, 330 F.2d 937 (2 Cir. 1964); United States v. Wai Lau, supra; United States v. Rivera, supra; United States v. Nicholas, 319 F.2d 697 (2 Cir. 1963); United States v. Williams, 219 F.Supp. 666 (S.D. N.Y.1963), aff'd per curiam, 336 F.2d 183 (2 Cir. May 15, 1964). Moreover, as Elgisser opened the rear door of the truck in response to Miller's knock, Miller observed, immediately before Elgisser was arrested, that the truck contained children's rubber boots, goods of the type which Miller had been informed had been stolen the previous weekend in the upstate New York burglary. Under all the circumstances, we think that the arrest of Elgisser, and the arrest of Gladstein a few minutes later, were both made upon probable cause.

The judgments of conviction appealed from are affirmed.

LUMBARD, Chief Judge (concurring).

I concur in affirming the judgments of conviction. However, as I believe that much of what Judge Waterman has written regarding probable cause is unnecessary to the facts of this case, I think it advisable to emphasize that here the FBI agents had probable cause to make the arrests on the basis of information in possession of the FBI and what they themselves knew and saw. This information and knowledge was quite apart from the reliability or unreliability of the person who informed them on the morning of December 11, 1961 that a Reo truck with a red cab and blue body parked in the vicinity of the Boston Post Road in the Bronx contained rubber boots and phonograph records which had just been stolen in Albany.

As Judge Waterman points out, the check which the agents then made and their own observations when the back of the truck was opened voluntarily in response to their knocking, taken together with the Bureau's confirmation of the fact that rubber boots and phonograph records had in fact been stolen the day before from a freight terminal owned by Crowe and Company, Inc., an interstate trucking firm, in Albany, were sufficient to give the agents probable cause to believe that a crime had been committed and that Elgisser and Gladstein were then and there in the act of committing the crime of which they stand convicted. Therefore, cases such as United States v. Robinson, 325 F.2d 391 (2 Cir. 1963) where the arresting officers knew nothing more than what the informant had told them, are not in point and need not be discussed.

FRIENDLY, Circuit Judge (concurring).

I concur in both opinions.