UNITED STATES of America,
Appellee,

v.

**Daniel BOZZA, Charles Mulhearn, Ronald Jones, Michael Pizzo, Salvatore Guarnieri, Anthony DeLutro, a/k/a Tony West, Appellants,**

No. 216, Docket 29797.

United States Court of Appeals
Second Circuit.

Argued Feb. 25, 1966.

Decided Aug. 1, 1966.

---

See also, D.C., 234 F.Supp. 15.

John R. Wing, Anthony F. Marra, New York City, for appellants Bozza, Mulhearn and Jones.

Leonard M. Marks, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Edward N. Costikyan, New York City, of counsel), for appellant Guarnieri.

John D. Lockton, Jr., William D. Conwell, New York City, for appellant Pizzo.

H. Elliot Wales, New York City, for appellant DeLutro.

Jerome C. Ditore, Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty., Eastern Dist. of New York, John Goldstein, Atty., Dept. of Justice, of counsel), for appellee.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

Six defendants, Bozza, Jones, Mulhearn, Pizzo, Guarnieri and DeLutro, appeal on numerous grounds from a judgment of the District Court for the Eastern District of New York convicting them of various crimes relating to the burglary of United States post offices in New Jersey and the transportation and receipt of stamps stolen therefrom. See 18 U.S.C. §§ 641, 2314. The trial, before Judge Mishler and a jury, lasted some thirty days; ten counts were ultimately submitted to the jury, a much simplified version of these appearing in the appendix to this opinion. After deliberating three and a half hours, the jury found all defendants guilty on all counts with which they were respectively charged; the court imposed sentences ranging from two to fourteen years, as indicated in the appendix.[1]

I. *The Government's Case.*

The Government's case save as to count 28 was presented primarily through an accomplice, Edward Kuhle, who testified at length as to the crimes charged: In January 1964 Bozza and Kuhle met in New Jersey and decided to burglarize a post office, Bozza's expressed motive being his need to pay off debts to Jones, Mulhearn and Pizzo. Requiring a fence, Bozza and Kuhle got in touch with Frank Polak, who lived in Astoria in the Eastern District of New York;[2] after a meeting there, to which they had driven in a Buick car owned by Jones but registered to Mulhearn, they agreed to meet Polak a few days later, by which time the stolen stamps were expected to be available. Using the Buick and tools which Jones, Mulhearn and Pizzo had loaned them, Bozza and Kuhle burglarized the Morganville Post Office, with disappointingly small results. They repeated the performance at Middletown a few nights later and had better luck. Loading the stolen stamps, worth some $5,000, in the trunk of the Buick, they drove to Frank Polak's home in Astoria, arranged a meeting in a drugstore in Manhattan and delivered the stamps; he took them to his brother Bedrich[3] and got the money which, after deducting a $500 fee, he turned over to Bozza and Kuhle. They returned to New Jersey where Bozza used some of his share to pay debts to Jones, Mulhearn and Pizzo.

Impecunious because of these payments, Bozza proposed another burglary. He, Kuhle and one Robert Williams[4] burglarized the Woodbridge Post Office, again using the same tools; they met with still greater success, making off with some $10,000 in stamps. Having telegraphed the good news to Polak and stopped at the Chris-Ann Motel in New Jersey to count the proceeds, they drove to New York the next day, met Polak in Astoria after sundry misadventures, and agreed on a further meeting for delivery and payment. Bozza and Williams spent the night at the same motel; Bozza was inadvertently locked out of the room and broke down the door. The following day, the trio rejoined Polak in Manhattan where delivery and payment were effected.

Between mid-February and mid-March, Jones and Mulhearn told Kuhle that Bozza still owed them money, and inquired how the burglary business was progressing. Bozza, admitting that he owed

---

1. The dates of the burglaries, all in 1964, were as follows:

 | | |
 |---|---|
 | Morganville | January 25 |
 | Middletown | January 28 |
 | Woodbridge | February 17 |
 | Keyport | March 12 |
 | Paramus | June 3 |
 | Hillsdale | June 23 |

 There was a second burglary of the Morganville Post Office on April 11 to steal a money order validating machine.

2. Frank Polak pleaded guilty before the trial and testified for the Government.

3. Bedrich Polak also pleaded guilty before the trial but did not testify.

4. Williams pleaded guilty before the trial but was unwilling to testify.

money to them as well as to Pizzo, expressed readiness for another try. He, Williams and Kuhle, utilizing the Jones-Mulhearn-Pizzo tools, "hit" the Keyport Post Office with only fair results in stamps but with a yield of 5000 blank money orders for $100 each. Again came a pause at a motel—this time the Skyway in Jersey City—to count the proceeds, a drive by Kuhle and Williams to Astoria, a meeting at a Manhattan drugstore, delivery, payment and division of the proceeds.

Although the purloined stamps had been moving smoothly into the stream of illicit commerce, the burglars had not yet found means for realizing on the stolen money orders despite their acquisition of such useful properties as validating stamps.[5] Five days after the Keyport burglary, Bozza phoned Kuhle that he had located buyers for the money orders in Brooklyn. Kuhle and Williams came to a Manhattan parking lot; Bozza took the money orders from Kuhle's car into his own, saying he was going to meet the purchasers, defendants Guarnieri and one Tony Santangelo.[6] The quintet met that evening in a Brooklyn bar, where Bozza announced that Guarnieri and Santangelo were handling the stolen money orders. During the rest of March, Bozza and Kuhle met frequently with Guarnieri in Brooklyn to discuss the subject. In the early part of April Guarnieri and Bozza told Kuhle they could pass $5,000 a day at the World's Fair if a validating machine could be procured. On April 11, Bozza, Williams and Kuhle stole one from the Morganville Post Office and repaired to Williams' home and forged several days' supply. They then made two trips to Brooklyn to give Guarnieri and Santangelo the merchandise.

The first rift in the lute came on April 23 when Kuhle was arrested on an unrelated charge by New Jersey police, who searched his house and found the tools used in the burglaries. Bozza's car, standing near Kuhle's house, was then searched pursuant to a warrant; the search produced the validating machine recently stolen from Morganville, money orders taken from Keyport, a stolen hand stamp and a stamp pad. Kuhle was released in May and apparently acted as an agent for the Government thereafter.

In the middle of May Kuhle went with Mulhearn to meet Guarnieri and Bozza in a Brooklyn bar called The Illusion; Guarnieri announced that he was keeping Bozza in his house to avoid apprehension by the New Jersey police and that Bozza, as usual, needed money since he was substantially in debt to Guarnieri and other Brooklynites; Guarnieri disclosed that he had some burglary tools in his car and went with Mulhearn to put them in Kuhle's. While Kuhle in the bar was watching the transfer of the tools, Bozza said he needed "work" and had to get away since "the Feds are in Brooklyn every day looking for me." Kuhle and Mulhearn drove back to New Jersey and left the tools at Nicholas Guzzo's home.[7] A few days later, by now early June, Guzzo delivered the tools to Jones and Kuhle who, together with Bozza, put them to immediate use in burglarizing the Paramus Post Office, where they obtained a good haul of stamps, worth $19,000. After going to Guzzo's house to count the loot and hide the tools, Kuhle drove Bozza on to Brooklyn. A call from him to Kuhle that Guarnieri was ready to pay $9,500 led Jones, Mulhearn and Guzzo to a Brooklyn rendezvous with Guarnieri; later Jones called Kuhle for

---

5. These included a validating stamp purloined during business hours from the Union City Post Office, which Bozza, Williams and Kuhle had entered to purchase a $2 money order to learn how such papers were validated. The money order clerk identified Bozza and picked out Kuhle's picture.

6. Santangelo's trial was severed because of a conflicting engagement in another trial.

7. Guzzo went to trial, testified on his own behalf, but pleaded guilty after cross-examination indicated the likelihood of the Government's introducing a tape recording of an incriminating interview by postal inspectors after Guzzo's arrest and before his arraignment. See Point IV infra.

a profit-sharing meeting with Mulhearn and Guzzo at a New Jersey bar; Bozza had received his share in Brooklyn.

There was to be one last fling. On June 23 Kuhle, Mulhearn and Jones, again using Guarnieri's tools, burglarized the Hillsdale Post Office. This last burglary was also the most fruitful in yield of stamps, worth $36,000, and, less fortunately, a .38 caliber gun. The three thieves returned to Guzzo's home where they counted the stamps; they left everything with Guzzo, telling him to get rid of the gun. But the loot proved hard to move, and the clouds were gathering. Frank Polak, Kuhle's prior outlet, had been arrested and nobody wanted to go to Brooklyn. Postal inspectors, armed with a warrant, searched Pizzo's house. This led to a council of war among Jones, Mulhearn, Pizzo and Kuhle. Jones' interest was excited by a statement in the affidavit for the search warrant that information had come from a previously reliable informant; he said a friend would find out who this was and the four would take care of him, with the four to shoot simultaneously. Kuhle, of course, was the informant. Finally, Mulhearn, Pizzo and Kuhle rented a car in Kuhle's name with the objective of going to see DeLutro, also known as Tony West, who first appears at this late stage. Finding him at a Manhattan coffee shop, they told him of the $36,000 of Hillsdale stamps. DeLutro indicated interest and promised to call them at a New Jersey bar that evening from Brooklyn. He did, asking for Pizzo; as arranged, Pizzo wrote down DeLutro's number, went to an outside telephone, and called him in Brooklyn. When DeLutro offered $10,-000, Kuhle took the phone and bargained until DeLutro raised the offer to $12,-000 which was accepted. DeLutro promised to meet the trio in Manhattan at 2:00 A.M.; using Kuhle's rented car they delivered the stamps to him. Later that same morning, they returned to New York with Jones; DeLutro complained about bringing in another guy, and Jones and Kuhle waited in a nearby bar while

Mulhearn and Pizzo collected $8,000. Still later DeLutro paid a further $2,000 at a place not identified.

Kuhle's exceedingly circumstantial story was substantiated in a number of ways in addition to those already noted, see fns. 2, 3 and 5, although none bore directly on the defendants' guilt. Kuhle made diagrams of the interior of the various post offices he had burglarized, which were verified by postal inspectors. The Government produced the telegram sent Frank Polak after the Woodbridge robbery, the registration cards from the Chris-Ann and Skyway Motels where the burglars had repaired after the Woodbridge and Keyport thefts, and the rental agreement for the car hired by Kuhle after the Hillsdale burglary. The night clerk at the Chris-Ann Motel remembered the breaking of the door and recalled Bozza, and employees of the auto renting agency identified Kuhle, Mulhearn and Pizzo.

Additional evidence was introduced to support Count 28, which charged Guarnieri with comforting and assisting Bozza, knowing the latter to have committed an offense. After a federal warrant for Bozza's arrest was issued on June 2, federal officers raided the Boro Lounge in Brooklyn, while Guarnieri was there. Each person in the bar was shown Bozza's picture, questioned as to his whereabouts, and told that he was wanted by federal authorities for violation of law. A few days later Guarnieri took Bozza upstate; there, on June 8, Bozza was arrested by New York state troopers.

II. *Admission of testimony as to burglary of the Fairview Post Office.*

Kuhle's narrative began, over defense objection, with a criminal episode slightly antedating the series we have recited. On January 15, at a bar in Union City, N. J., Jones, Mulhearn and Pizzo told Kuhle and another friend, Donald Smith,[8] of a "very, very big score" they had made in burglarizing the post office at Fairview, N. J. Kuhle suggested that their success should enable them to help their mutual

8. Smith testified for the Government, corroborating Kuhle's tale of the interview.

friend Bozza. When the trio declined on the ground they hadn't received all their money yet, Kuhle responded, in words reminiscent of a better cause, that if they would give him their tools, he would do the job. They assented to this, and also asked Kuhle to act as their "cover" next morning when they proposed to sell the stolen Fairview stamps in Manhattan to "Indian Joe" Fallo; he agreed, and testified in great detail and with considerable color as to how he was summoned to cover Jones after the stamps had been handed over to Fallo; how Fallo, left alone momentarily in a car, ran off before paying for the goods; and how, despite initial consternation, the money was eventually received. A photograph of the violated safe at the Fairview post office was received; so also was an admission by Jones, the effect of which will be considered in Point III.

█ Jones, Mulhearn and Pizzo contend that it was error to receive this evidence of a crime which was not and, for lack of venue, could not have been charged in the indictment,[9] since it does not fall under any recognized exception to what they claim to be a general prohibition of evidence of other crimes. The rule in the federal courts is not so formalized; evidence of another crime may be introduced if, though only if, it "is substantially relevant for some other purpose than to show a probability" that the defendant "committed the crime on trial because he is a man of criminal character." McCormick, Evidence § 157, at 327 (1954); Lovely v. United States, 169 F.2d 386, 388–389 (4 Cir. 1948); Swann v. United States, 195 F.2d 689, 690–691 (4 Cir. 1952); Model Code of Evidence, Rule 311; Note, Other Crimes Evidence at Trial: Of Balancing and Other Matters, 70 Yale L.J. 763, 767–69 (1961). A more detailed and illuminating formulation is that

"the problem is not merely one of pigeon-holing, but one of balancing, on the one side, the actual need for the other-crimes-evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes-evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility." McCormick, supra at 332.

Pertinent also is the statement in Quarles v. Commonwealth, 245 S.W.2d 947, 948–949 (Ky.1951):

"evidence of an independent offense is inadmissible even though it may have some tendency to prove the commission of the crime charged, because the probative value of the evidence is greatly outweighed by its prejudicial effect. This is especially so where the evidence is of an isolated, wholly disconnected offense. But the balance of scales is believed to be the other way where there is a close relationship to the offense charged."

█ The Fairview burglary had about as close a relationship to the offenses charged as can be imagined; indeed, if the evidence of Kuhle's talk with Jones, Mulhearn and Pizzo after the burglary had been omitted, the jury would have had only a truncated version of what was claimed to have occurred. The earlier episode was relevant in several ways. Knowledge of the success at Fairview was what led to the request for and the loan of the tools that enabled Kuhle and Bozza to effect their "hits" at Morganville, Middletown, Woodbridge and Keyport. Proof that Jones, Mulhearn and Pizzo had loaned the tools for the known purpose of enabling Kuhle to "hit" a post office and thereby help Bozza to repay debts to the trio was not merely relevant but almost basic to Count 6, charging them with conspiracy in these burglaries at which they were not physi-

---

9. Lack of venue doubtless was why it was not charged; on the other hand, we see no reason why Count 6 could not have been broadened to include the Fairview burglary as an overt act.

cally present; the evidence permitted the jury to conclude not only that they knowingly made tools available for the crimes but encouraged such use in order to collect Bozza's indebtedness. The association begun as the aftermath of Fairview was relevant also to the counts linking Jones, Mulhearn and Pizzo with the Paramus and Hillsdale burglaries and the sale of their proceeds. Although what was most directly relevant was not the fact of the Fairview burglary but its significance in the later interview between the three participants and Kuhle, the principle of completeness justified telling all that was said, see 7 Wigmore, Evidence § 2094 (3d ed. 1940); McCormick, Evidence § 56 (1954), and evidence that the post office had in fact been burglarized was probative by way of corroboration. On the other side, the danger that the jury would "probably be roused by the evidence to overmastering hostility" was minimal. The temperature generated by Kuhle's narration of six post office burglaries was not likely to be significantly augmented by evidence that still another had gone before. Hence with respect to the Fairview burglary itself,[10] this was not at all a case "where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it." State v. Goebel, 36 Wash.2d 367, 379, 218 P.2d 300, 306 (1950). Failure to include a charge on the limited purpose for which the evidence could be considered cannot be raised on appeal where no request for this was made to the trial court. F.R.Crim.P. 30; see

United States v. Sherman, 171 F.2d 619, 624 (2 Cir.), cert. denied, 337 U.S. 931, 69 S.Ct. 1484, 93 L.Ed.2d 1738 (1948); Berry v. United States, 271 F.2d 775 (5 Cir. 1959), cert. denied, 362 U.S. 903, 80 S.Ct. 612, 4 L.Ed.2d 555 (1960); Baker v. United States, 310 F.2d 924, 929–930 (9 Cir.), cert. denied, 372 U.S. 954.[11] Under these circumstances the court's general charge that testimony of an accomplice "should be received with great caution and weighed with great care" and that the jury should not convict "upon the unsupported evidence of an accomplice unless you believe the unsupported testimony supports the Government's charge beyond a reasonable doubt" sufficiently covered the Fairview evidence, at least in the absence of a request for an instruction that the burglary should not be considered unless the jury was satisfied that the crime had been clearly shown. See McCormick, supra at 331 and n. 22.

### III. Jones' Confession.

After Kuhle had testified, the Government sought to introduce a post-arraignment confession given by Jones about the events surrounding the Fairview, Paramus and Hillsdale burglaries. In the confession as signed Jones admitted that:

(1) On January 12, he, Mulhearn and Pizzo broke into the Fairview Post Office, and broke open a safe therein. They took the proceeds first to the home of Pizzo's brother and then to Journal Square in Jersey City where they met Joe Fallo, to whom Pizzo had

10. We recognize that the testimony of the gun-toting involved in the disposition of the Fairview stamps was more likely to arouse prejudice and thus might stand on a weaker ground. In view of our decision on Point III, infra, however, we need only determine its effect with respect to Jones. In the light of his confession and Kuhle's testimony describing Jones' active role in insisting that the conspirators "take care of" the informant, the description of his conduct in disposing of the Fairview stamps could not have been sufficiently prejudicial to require reversal of his convictions.

11. Counsel for Pizzo has called attention to the dismissal of an indictment, after the instant trial, on a state charge of burglarizing the Paramus Post Office, at which Kuhle was available to testify but was not called. Though it has been said that a prior acquittal would at the least significantly undercut "the convincingness of the evidence that the other crimes were committed and that the accused was the actor," McCormick, supra at 332, this consideration is scarcely applicable under the circumstances here presented. The judge will be free to evaluate the matter at a new trial; we intimate nothing as to the result.

arranged to sell "the stuff." Jones and Fallo drove to New York City, where Jones waited in a bar while Fallo went off with the stamps. Jones telephoned Kuhle to come over and "cover" him when he got the money from Fallo, which Kuhle did. Though Kuhle reported that Fallo had taken off when the other later left him alone in a car, the money was later secured.

(2) On June 3, he, Bozza and Kuhle broke into the Paramus Post Office. They took the stamps and tools to Guzzo's home. Kuhle drove Bozza back to Brooklyn. On the following day Guzzo delivered "the stuff" and Jones, Mulhearn and Guzzo took it to Bozza; Bozza handed it on to Guarnieri. Next day Jones, Mulhearn and Guzzo met Bozza and Guarnieri in Brooklyn to receive $9,500 in payment; after sharing some of the profits with Mulhearn and Guzzo, the burglars split the remainder three ways.

(3) On June 23, Jones, Mulhearn and Kuhle burglarized the Hillsdale Post Office. They took "the stuff," the tools and a stolen gun to Guzzo's house. Two days later they and Pizzo went over to Manhattan and met Tony West. Since Tony didn't want to do business while all were there, Kuhle and Jones waited in a bar. Ultimately $9,000 was collected.

After a postal inspector had testified to the taking of Jones' confession, counsel for the other defendants, all of whom were named in it, moved for a severance; this was denied. Over objection by counsel for all defendants save DeLutro, the judge permitted the prosecutor to read the confession to the jury, with the word "blank" replacing each name except Kuhle's; he forthwith instructed that the statement could "only be assessed against the defendant Jones," that the jury should not "try to speculate as to

how else this might be assessed because of the form" in which it had been presented, and that they were to consider it only against Jones as they would have if he had been separately tried. The prosecutor's use of the confession in his summation was consistent with this instruction, and the judge repeated it in his charge. An hour after retiring, the jury, accepting a suggestion in the prosecutor's summation, asked for Jones' confession—the only item of evidence so requested; this was furnished, without repetition of the instruction, with the names blacked out.

█ Not even appellate judges can be expected to be so naive as really to believe that all twelve jurors succeeded in performing what Judge L. Hand aptly called "a mental gymnastic which is beyond, not only their powers, but anybody's else." Nash v. United States, 54 F.2d 1006, 1007 (2 Cir. 1932). It is impossible realistically to suppose that when the twelve good men and women had Jones' confession in the privacy of the jury room, not one yielded to the nigh irresistible temptation to fill in the blanks with the keys Kuhle had provided and ask himself the intelligent question to what extent Jones' statement supported Kuhle's testimony, or that if anyone did yield, his colleagues effectively persuaded him to dismiss the answers from his mind. It well may be that a juror's engaging in this process "furthers, rather than impedes, the search for truth," as Judge Hand suggested, 54 F.2d at 1007. So, as some think, would the introduction of many statements banned by the hearsay rule.[12] But the Sixth Amendment guarantees every accused the right "to be confronted with the witnesses against him," and it "cannot seriously be doubted at this late date that the right of cross-examination is included" in the constitutional guarantee.

---

12. The Government properly does not contend that Jones' post-arraignment statement came within the hearsay exception for a declaration in furtherance of a conspiracy. See Krulewitch v. United States, 336 U.S. 440, 442–443, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Lutwak v. United States, 344 U.S. 604, 617–618, 73 S.Ct. 481, 97 L.Ed. 593 (1953); Delli Paoli v. United States, 352 U.S. 232, 237, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

Pointer v. State of Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

The Government argues that however this may stand as a matter of good sense, Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), and decisions of this court cause it to stand otherwise as a matter of law; these decisions, it argues in substance, have created a conclusive presumption that the jury will follow a proper instruction to consider a confession only against the confessor and to ignore its significance as to other defendants.

We do not read Delli Paoli as going so far. Indeed, as was immediately noticed, the novelty of the decision lay not in the result but in the agreement of the five Justices in the majority and the four dissenters in refusing to consider an instruction as inevitably sufficient, cf. Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947), thereby implicitly recognizing that there may be situations in which admission of a confession implicating co-defendants would be prejudicial in spite of proper instruction. See Note, Developments in the Law-Criminal Conspiracy, 72 Harv. L.Rev. 920, 990 (1959). The majority defined the issue as being "whether, under all the circumstances, the court's instructions to the jury provided * * * sufficient protection" against misuse of the confession; determination of that issue depended on (1) "whether the instructions were sufficiently clear," as Judge Mishler's certainly were in this case, and (2) "whether it was reasonably possible for the jury to follow them." 352 U.S. at 239, 77 S.Ct. at 299. The Court noted five factors, the combination of which was thought to warrant an affirmative answer to the second question in Delli Paoli's case. Ours differs in a number of significant respects. The conspiracy charged was not "so simple in its character that the part of each defendant in it was easily understood," 352 U.S. at 241, 77 S.Ct. at 299; three separate conspiracy counts and seven substantive counts were sent to the jury. Here the other defendants requested a severance as soon as the Government's intention to offer the confession became known. Contrast 352 U.S. at 241, 77 S.Ct. 294 and United States v. Leviton, 193 F.2d 848, 856 (2 Cir. 1951), cert. denied, 343 U.S. 956, 72 S.Ct. 860, 96 L.Ed. 1350 petit. for rehearing denied, 343 U.S. 988, 72 S. Ct. 1079, 96 L.Ed. 1375 (1952). Although in a sense the confession in both cases "merely corroborated what the Government already had established," 352 U.S. at 242, 77 S.Ct. at 300, the similarity is more formal than real. Whereas the admission in Delli Paoli was hardly critical to a case already made out by testimony of outside observers, Jones' confession furnished devastating corroboration of the heavily attacked testimony of an accomplice on which the prosecution almost entirely depended for proof of guilt.[13] This admission by a defendant that Kuhle had worked with him and all the others probably ended whatever chance any of them might have had to find a juror unconvinced of his guilt beyond a reasonable doubt. Indeed, even if the jury could perform the feat of not speculating over the inserted blanks, Jones' confession of his own association with Kuhle would have a serious spillover effect at least on Mulhearn and Pizzo. Finally, the jury's request for Jones' confession, which they would hardly have needed if their interest were solely in its bearing on Jones' guilt,[14] creates a real doubt, not present in Delli Paoli, that at least some of them, "failed to follow the court's instructions." 352 U.S. at 242, 77 S.Ct. at 300. We therefore cannot regard

13. Cross-examination established that Kuhle had an extensive criminal record, that numerous federal and state charges were pending against him, and that he had lied to both state and federal officers as to a number of the post office burglaries to which he testified.

14. The Government's suggestion that the jury needed to see the confession to determine its voluntariness is far from persuasive.

*Delli Paoli* as controlling in the Government's favor.

The three decisions of this court on which the Government most heavily relies are United States v. Caron, 266 F.2d 49 (1959), United States v. Castellana, 349 F.2d 264 (1965), cert. denied, 383 U.S. 928, 86 S.Ct. 935, 15 L.Ed.2d 847 (1966), and United States v. Casalinuovo, 350 F.2d 207, 211–214 (1965).[14a] The *Castellano* decision is readily distinguishable since, as Judge Kaufman carefully pointed out, there was less danger than in *Delli Paoli* of "prejudicial spill-over effect on the defendants other than the declarant," 349 F.2d at 274–275, whereas here there was clearly more. So also is *Casalinuovo*; not only did the case present all but one of the five factors stressed in *Delli Paoli*, as Judge Moore noted, 350 F.2d at 212, but the co-defendants made no motion for severance and no objection to the receipt of the confession until the Government's summation. The *Caron* decision is closer since a timely motion for severance was made, but the court stressed that the prosecution's case rested heavily on the testimony of two witnesses who were not parties to the conspiracy. Without going so far as to say that the logic of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964), necessarily removes any basis for relying on an instruction to limit the damaging effects of a confession implicating a co-defendant, cf. 378 U.S. at 434–435, 84 S.Ct. 1774 (dissenting opinion of Harlan, J.); People v. Aranda, Cal., 47 Cal.Rptr. 353, 359–360, 407 P.2d 265, 271–272 (1965) (Traynor, C. J.), but see Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, 1966, discussed in the dissent, we think the circumstances here were such as to put the Government to the choice which Judge Frank in this court, 229 F.2d at 324, and the four dissenters in the Supreme Court thought to have been demanded in *Delli Paoli*—either accept a severance of the trial of the confessor or forego use of the confession. By this ruling we do not mean to cast general doubt on the value of instructions to disregard or limit evidence, cf. United States v. Gorman, 355 F.2d 151, 153 (2 Cir. 1965); we hold only that there is a point where credulity as to the efficacy of such instructions with respect to a confession implicating co-defendants is overstrained, and that this point was reached here.

■ The error in continuing the joint trial with Jones' confession in evidence requires reversal of all convictions where the confession implicated one of the appellants in the crime charged, namely, the convictions of Bozza, Mulhearn and Guarnieri on Counts 21, 23 and 24 relating to the Paramus burglary, and of. Mulhearn, Pizzo and DeLutro[15] on Counts 26 and 27 relating to the Hillsdale burglary. On the other hand Jones does not urge in this court that the confession, which recites the receipt of warning that he did not have to make any statement unless he so desired and to have counsel while making it, was inadmissible as to him, and his convictions thus remain unaffected. This leaves for consideration the conviction of Bozza on substantive Counts 1, 4 and 5 relating to the Morganville, Middletown, Woodbridge and Keyport burglaries, the conviction of Bozza, Mulhearn and Pizzo on conspiracy Count 6, relating to the same, and that of Guarnieri on Count 28 relating to comforting and assisting Bozza knowing he had committed the Keyport burglary. As

---

14a. United States v. Elgisser, 334 F.2d 103, 107–108 (2 Cir. 1964), relied on by the dissent, did not involve evidence so damaging as implication by a confession, and much of the evidence was fully admissible since two co-defendants testified as to their statements. See 334 F.2d at 108.

15. Although DeLutro's counsel did not expressly join in the objection to admission of the confession, he had moved for a severance; moreover the record suggests that the judge assumed all counsel were objecting to receipt of the confession since it had been stipulated that an objection or motion by counsel for one defendant was to be deemed to benefit all affected. In any event the point becomes academic in view of our ruling on Point V infra.

to the last, the confession's reference to connections between Bozza and Guarnieri after the Paramus burglary might well have affected the jury in passing on this Count. The question as to Counts 1, 4, 5 and 6 is harder since Jones' confession, vaulting from the Fairview burglary in January to the Paramus episode in June, said nothing about the four burglaries in between. But the same theory on which we have supported the receipt of the testimony as to the Fairview burglary for its bearing on the others works against the Government on this point; since that evidence was sufficiently probative to justify admission although showing another crime, the significance of its repetition in Jones' confession as corroborating Kuhle's account of the intermediate burglaries was likewise substantial enough to have been prejudicial on the facts here.

■■ We reverse these five convictions with regret. Judge Mishler was painstaking and adept in his conduct of this difficult trial, and the Government's presentation was generally a fair one. It would be far easier if an appellate court could shirk the task of determining whether the *Delli Paoli* limits have been exceeded, by simply bowing to the trial court's discretion. A large measure of such respect is indeed demanded. The trial judge may be better able to prophesy the capacity of a particular jury to follow limiting instructions which Judge Learned Hand considered beyond his intellectual powers, and the necessary weighing of disparate factors demands deference in the interest of avoiding the mere substitution of one fallible judgment for another on what are imponderables on any view. However, despite the concluding remarks in *Delli Paoli* as to the discretion of the trial judge, 352 U.S. at 243, 77 S.Ct. at 300, we do not believe the Court meant that his decision whether a case presented nigh impossible "practical limitations" to the jury's following instructions should be free from meaningful review. See Note, 72 Harv.L.Rev. supra at 990. Taking as the appropriate standard that the decision of the trial court on such an issue "cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors," In re Josephson, 218 F.2d 174, 182 (1 Cir. 1954) (Magruder, J.), and fully recognizing the difficult problem that confronted the trial judge, we have such a "definite and firm conviction" here. Having this, we are unable to avoid reversal by invoking the principle of harmless error. To be sure the evidence apart from Jones' confession was ample for convictions on all counts if the jury believed Kuhle, as we have relatively little doubt it would have even without the impressive corroboration which the confession furnished. However, it is not enough "that the jury would have in all probability returned a verdict of guilty" against the other defendants without knowledge of Jones' confession, which they were forbidden to possess. Sunrall v. United States, 360 F.2d 311, 314 (10 Cir. 1966). The test is whether belief "is sure that the error did not influence the jury, or had but very slight effect," Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1257 (1946)—even if that be the standard in an area with "grave constitutional overtones." Cf. Grunewald v. United States, 353 U.S. 391, 423, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). We cannot conscientiously answer that question in the affirmative in this case, however much we would like to do so.

IV. *The Government's cross-examination of Guzzo as to his pre-arraignment statements.*

As indicated above, Guzzo first appears in the cast of characters on the night of the Paramus burglary. A co-defendant on the counts relating to the Paramus and Hillsdale episodes, he took the stand at the end of the trial and denied any criminal involvement. Although admitting acquaintance with some of his co-defendants, he claimed this was entirely innocent; he said he had never met others, Guarnieri and DeLutro, until preparation for the trial; such of the

tools as he admitted owning were for reconstructing the bar that he operated; he had received the stolen gun from Kuhle as a pledge for an outstanding debt. The prosecutor then informed the judge and defense counsel that the Government had a tape recording of an interview of Guzzo, taken between arrest and arraignment, which it had not offered in its case in chief due to fear of possible objection under Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).[16] The prosecutor announced his intention to lay a basis for introducing the tape recording for purposes of impeachment [17] by inquiring whether Guzzo recalled being asked certain questions by and giving certain answers to the inspectors. When it became apparent that the answers to be read in impeachment would implicate codefendants, counsel for the latter sought a severance; the judge declined to grant this but promised to present the same limiting instructions as given with respect to Jones' confession. The prosecutor then asked whether Guzzo remembered a variety of questions and answers—the latter identifying Jones, Mulhearn, Guzzo and Guarnieri as transporters and receivers of the Paramus stamps, and Guzzo as keeper of the tools. The judge instructed the jury to consider the interrogation as if Guzzo were being tried alone. Guzzo denied recalling any of the questions or answers; on redirect examination, while conceding that he had

been questioned by the inspectors, he denied any incriminating answers. On the next day he pleaded guilty, the judge told the jury his case had been severed, and the tape recording was never offered.

■ Although Bozza, Mulhearn, Pizzo, Guarnieri and Jones complain of this episode on grounds similar to those discussed in the preceding point, we need not concern ourselves with the contentions of the first four since we are reversing their convictions because of the admission of Jones' confession and the question will hardly arise on a new trial. The issue thus relates only to Jones. Although the problem has its resemblances to that arising from the receipt of his confession, it likewise has significant differences favorable to the Government.[18] Guzzo denied all the answers, and though the tenor of the cross-examination suggested that his inconsistent statements might be proved, the Government never offered them and no admission by him incriminating Jones was submitted to the jury; this is a considerable distance from Jones' written confession, not merely in evidence but physically in the jury room. The Government had no reason to anticipate that Guzzo would take the stand; there was therefore less reason for it to have sought severance as to him at the outset than with respect to Jones whose confession it meant to use. More important, if the jury considered Jones' confession to have

---

16. Guzzo was arrested about 10:00 A.M. but was not taken before a commissioner until around 3:30 P.M. However, the prosecutor considered the delay not unreasonable because of the need to inventory the large haul of tools and guns from Guzzo's home; also Guzzo had attempted at first to delude the inspectors by a claim that he was working in an undercover capacity with the New Jersey police. The prosecutor explicitly declined to concede that the statement could not have been introduced under *Mallory*.

17. The prosecutor thought this would be proper under Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), even if, as he denied, *Mallory* would have precluded receipt of the statement during the Government's case.

18. If the facts had been developed, it might also have presented one that could be considered unfavorable. Whereas Jones' confession was admissible against him, Guzzo's statement may not have been admissible even against himself. People v. Aranda, Cal., 47 Cal.Rptr. 353, 407 P.2d 265, 269–270 (1965), suggests this would tip the scale in favor of a co-defendant implicated by the confession since no value was served by its introduction at the joint trial. But the record does not compel the conclusion that a *Mallory* objection would have been valid, see fn. 16, and if the defendants wished to rely on this, it was incumbent on them to lay the necessary factual predicate. We therefore find it unnecessary to pass on the *Walder* question, see fn. 17.

been voluntary—and his brief on appeal suggests no reason why it should not have—the evidence of his participation in the Paramus and Hillsdale burglaries [19] was such that even if error could be found in denying severance and permitting Guzzo to be asked about his prior statements, "it is unbelievable that a rational jury would have acquitted if this error had not occurred." United States v. Tramaglino, 197 F.2d 928, 932 (2 Cir.), cert. denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952); cf. Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1257 (1946).

V. *Objections with respect to venue.*

We deal here with objections to venue which are urged to require dismissal of three substantive counts of receiving stolen stamps or aiding and abetting their receipt—Counts 4 and 5 directed at Bozza, and Count 26 directed at DeLutro as principal, and Jones, Mulhearn and Pizzo as aiders and abettors. It will be convenient to begin with Count 26.

 The only acts shown to have occurred in the Eastern District of New York with respect to this count were DeLutro's making and receiving telephone calls on a visit to Brooklyn for an unspecified purpose, during which he agreed to buy the stamps stolen from Hillsdale and bargained about the price, and his driving from the point of the call to Manhattan to receive them. The Government relies on the continuing offense statute, 18 U.S.C. § 3237(a), which states:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Appellants say that the offense of receiving stolen Government property, 18 U.S.C. § 641, does not begin until receipt and that the proof showed any receipt of the stamps by DeLutro was in the Southern District of New York.

It is arguable, as the Government urges, that no violence is done to the normal use of language by regarding the making of a contract to receive as the "beginning" of a receiving, and we entertain no doubt that Congress could so provide. But the cases draw a distinction between a continuing offense which is "held, for venue purposes, to have been committed wherever the wrongdoer roamed," Travis v. United States, 364 U.S. 631, 634, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961); see United States v. Cores, 356 U.S. 405, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958), and "a single act which occurs at one time and at one place in which only it may be tried, although preparation for its commission may take place elsewhere." Reass v. United States, 99 F.2d 752, 754 (4 Cir. 1938) (Soper, J.); United States v. Anderson, 328 U.S. 699, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946); Travis v. United States, supra. In Burton v. United States, 196 U.S. 283, 296–304, 25 S.Ct. 243, 49 L.Ed. 482 (1905), the Supreme Court held that an indictment of a United States Senator for receiving compensation in a matter in which the United States was interested, see 18 U.S.C. § 281, could not be laid in St. Louis, the place of the mailing of a check on a St. Louis bank which the Senator deposited in a Washington, D. C., bank; having concluded that the deposit was a sale of the check, thereby ruling out a theory that the Senator realized nothing until it was honored by the St. Louis bank, the Court expressly disapproved an alternative argument that the mailing of the check was the beginning of a receiving under the predecessor of 18 U.S.C. § 3237. Compare Benson v. Henkel, 198 U.S. 1, 9 (1905), and see Dobie, Venue in Criminal Cases in the United States District Court, 12 Va.L.Rev. 287, 289–290 (1926). The

---

19. Guzzo's statement said nothing about the first four burglaries (Count 6) or about Fairview.

recent decision in United States v. Johnson, 337 F.2d 180, 193–195 (4 Cir. 1964), aff'd without discussion of this point, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), is not to the contrary, although some of its language may be; the holding was that a Congressman could be tried in Maryland for receiving when he had deposited in Maryland banks checks on Maryland and Florida banks delivered to him in Washington, D. C. A number of state decisions hold the receiving of stolen goods to be a single step crime, many expressly refusing to regard it as a continuing offense within state statutes comparable to § 3237. See Sledge v. State, 40 Ala.App. 671, 122 So.2d 165 (1960); People v. Stakem, 40 Cal. 599 (1871); Allison v. Commonwealth, 83 Ky. 254 (1885); State v. Ellerbe, 217 La. 639, 47 So.2d 30 (1950); People v. Zimmer, 174 App.Div. 470, 160 N.Y.S. 459 (1916), aff'd, 220 N.Y. 597, 115 N.E. 1047 (1917); State v. Pray, 30 Nev. 206, 94 P. 218 (1908); 4 Wharton, Criminal Law and Procedure § 1510, at 101–02 (1957); 22 C.J.S. Criminal Law § 185(22). To such extent as the issue is doubtful, it is best to resolve the doubt in favor of a construction which will ensure trial where witnesses to the receiving are more likely to be present; otherwise the mere happenstance of a telephone call from a district, possibly remote, where a defendant chanced to be, could deprive him of the protection of the Sixth Amendment. United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236 (1944). Accordingly the convictions on this Count must be vacated and the Count dismissed for lack of venue in the Eastern District of New York.

 The situation with respect to Count 4 which named Frank and Bedrich Polak as principals and Bozza and others as aiders and abettors for receiving the proceeds of the Woodbridge burglary is wholly different. Although Frank Polak lived in the Eastern District and engaged in more preliminary activities there than did DeLutro, whose presence in Brooklyn on the occasion of the telephone call appears to have been only accidental, we ac-cept that, for reasons just stated, Polak could have been tried for receiving only in the Southern District of New York. However, Bozza himself engaged in various accessorial acts in the Eastern District, and at common law could have been tried for them there, and indeed only there. See United States v. Gillette, 189 F.2d 449, 451 (2 Cir.) cert. denied 342 U.S. 827, 96 L.Ed. 661, petit. for rehearing denied 342 U.S. 879, 72 S.Ct. 164 (1951), motion for leave to file second petit. for rehearing denied 345 U.S. 945, 73 S.Ct. 827, 97 L.Ed. 1370 (1952). This court held in *Gillette* that 18 U.S. C. § 2, which would have permitted Bozza to be tried in the Southern District as a principal, "does not supersede the common law rule of venue but provides an additional venue." 189 F.2d at 451–452. The venue of this count was proper.

 The issue as to Count 5, making charges with respect to the Keyport stamps identical with those in Count 4 as to Woodbridge, raises still another question. Here again the receiving was in the Southern District but, in contrast to Count 4, Bozza himself performed no accessorial acts in the Eastern District although his confederates, Williams and Kuhle, did. While we perceive no constitutional obstacle to Bozza's being tried in the Eastern District for causing Williams' and Kuhle's accessorial acts there, we have been furnished no authorities to show that the common law would have permitted this and we do not read the statute, 18 U.S.C. § 2, as doing so. Although this would authorize trial of Bozza in the Southern District of New York as a principal for the crime of receiving the Keyport stamps even though he remained in New Jersey, its words do not seem apt to confer additional venue in the Eastern District for his causing Williams and Kuhle to abet there; Congress seems to have been content with venue where the defendant's own accessorial acts were committed or where the crime occurred, without providing still another where the accessorial acts of agents took place. It could indeed be argued that the single step theory, however suitable to receiv-

ing, is inapplicable to aiding and abetting a receiving. But we think the "offense" mentioned in 18 U.S.C. § 3237(a) is the substantive crime defined in the Code and not the aiding or abetting of it. The judgment convicting Bozza on this count must therefore be vacated and the count dismissed for improper venue.

## VI. *Search and seizure objections.*

We now turn to a number of objections relating to evidence allegedly obtained by illegal searches and seizures, both insofar as these may affect Jones' convictions which we have thus far found no sufficient reason to disturb, and as they may recur on the new trial of the other defendants.

A search of Guzzo's home, pursuant to warrant issued on July 8, led to the discovery of the gun stolen from the Hillsdale Post Office. Before the trial, Guzzo, who was represented by the same lawyer as Mulhearn, moved for suppression of the fruits of the search on the ground that the affidavit of Inspector Pallantios had overstated his acquantance with the informer on whose representations the warrant was to be issued. The judge denied the motion, finding the statements in the affidavit to be true. This ruling is challenged in the face of a serious question whether objection was properly preserved by Guzzo's motion to suppress.[20] Deeming it best to deal with the merits not only to dispel any doubts with respect to Jones' convictions but to resolve any uncertainty on retrial, we hold the evidence was properly admitted, on two independent grounds. None of the appellants was entitled to object to the receipt of objects seized in Guzzo's home which were not owned or possessed by him and had only evidentiary significance against him; and, assuming as we do that, although sufficient on its face, Pallantios' affidavit can be attacked for known untruths, it was not so defective as to invalidate the warrant.

The Supreme Court's most recent comprehensive statement on the subject of "standing" to invoke the rule excluding real evidence obtained by illegal search and seizure is Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960). The Court there said, through Mr. Justice Frankfurter:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. Rule 41(e) applies the general principle that a party will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.' Hatch v. Reardon, 204 U.S. 152, 160 [27 S.Ct. 188, 190, 51 L.Ed. 415]. The restrictions upon searches and seizures were obviously designed for protection against official invasion of privacy and the security of property. They are not exclusionary provisions against the admission of kinds of evidence deemed inherently unreliable or prejudicial. The exclusion in federal trials of evidence otherwise competent but gathered by federal officials in violation of the Fourth Amendment is a means for making effective the protection of privacy."

Consistent with that view the Court has held that a defendant has standing to object not only to a search of premises owned or leased by him but also to the search of premises where he was present by consent of the owner or possessor, Jones v. United States, supra, 362 U.S. at 265–267, 80 S.Ct. 725; to the seizure of property for the illegal possession of which he is charged, Jones v. United States, supra, 362 U.S. at 263, 80 S.Ct. 725; and to the seizure of property owned or possessed by him and stored in the premises of another to which he had access, United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). The instant case

**20.** The stipulation that denial of an objection or a motion should enure to the benefit of all defendants did not cover pre-trial motions.

does not come within either the general language of the quoted passage or these specifications. The gun stolen from the Hillsdale Post Office remained the property of the United States; the thieves abandoned its possession to Guzzo; none of them was present in Guzzo's home at the time of the search; and none was charged with an offense for mere possession of the gun. Appellants' broader position that if any defendant is entitled to suppression, erroneous denial of a motion on his behalf is error as to all, finds its sole Supreme Court support in a passage in Mr. Justice Douglas' opinion in McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948), dealing with the co-defendant Washington. How this opinion was "of the Court," as the reporter describes it, is not easy to understand, see Rosencranz v. United States, 334 F.2d 738, 741 (1 Cir. 1964) (concurring opinion of Judge Aldrich), since only Justices Frankfurter, Murphy and Rutledge joined in it.[21] Mr. Justice Frankfurter also joined in Mr. Justice Jackson's concurring opinion which went on the ground taken as one basis for the later decision in *Jones,* that as a guest on the premises Washington could "expect the shelter of the rooftree he is under against criminal intrusion." 335 U.S. at 461, 69 S.Ct. at 196. Mr. Justice Frankfurter's subsequent formulation for the whole Court in the *Jones* case seems inconsistent with Mr. Justice Douglas' rationale in *McDonald,* of which the Court made no mention in *Jones* despite citation by the parties. The portion of Wong Sun v. United States, 371 U.S. 471, 492 (1963), upholding the admission against Wong of the narcotics seized from Yee as a result of the illegal arrest of Toy, despite the parties' citation of *McDonald,* is likewise inconsistent with a rule that if evidence is subject to suppression at the instance of one defendant, it must be open to challenge by all. The values that the Fourth Amendment protects are sufficiently advanced by excluding the results of illegal searches and seizures at the behest of "victims" in the broad sense the Supreme Court has given that term; we see no important purpose to be served by holding that a thief who has left evidence of his crime on the premises of a confederate is subrogated to the latter's right to complain of a search and seizure, so that he may exercise this although the confederate has not elected to do so or to pursue an election once made. See United States v. Lee Wan Nam, 274 F.2d 863 (2 Cir.) cert. denied, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1147 (1960); United States v. Serrano, 317 F.2d 356 (2 Cir. 1963); Staples v. United States, 320 F.2d 817, 820–821 (5 Cir. 1963); United States v. Grosso, 358 F.2d 154, 161 (3 Cir. 1966); Diaz-Rosendo v. United States, 357 F.2d 124, 130–134 (9 Cir. 1966) (in banc). But see Rosencranz v. United States, 334 F.2d 738 (1 Cir. 1964), 356 F.2d 310 (1 Cir. 1966); Nelson v. United States, 93 U.S.App.D.C. 14, 208 F.2d 505, 514, cert. denied, 346 U.S. 827, 74 S.Ct. 48, 98 L.Ed. 352 (1953). See also Case Note, Search and Seizure: Admissibility of Illegally Acquired Evidence Against Third Parties, 66 Colum.L.Rev. 400 (1966); Maguire, Evidence of Guilt 214–16 (1959). Indeed, we perceive no reason why, even if an aggrieved person has secured suppression to which he is entitled, the evidence should be forever clothed with immunity from subpoena in the prosecution of another who was without standing to obtain this.

█ Alternatively we find the criticism of the affidavit unduly technical. Inspector Pallantios cited information "by a previously reliable confidential informant, who is known to your deponent and who has given information to your deponent in the course of his official investigations on at least two prior occasions and which information has proven to be reliable." The appellants' insistence that in fact Pallantios had met the informant Kuhle only on the preceding day, and that on the two prior

<hr>

21. Mr. Justice Black concurred in the result and Mr. Justice Jackson concurred on other grounds. Three Justices dissented.

occasions the information had been given to Inspector Shatzel stresses form at the expense of substance. The statement that the informant was "known" to Palantios was wholly accurate; although Pallantios had not met Kuhle until the day before, the meeting lasted thirty hours—quite long enough for Pallantios to "know" him. And Shatzel testified that on the two "prior occasions," when information given by Kuhle led to arrests and the discovery of stolen property, he kept Pallantios informed of what he was learning and repeatedly confirmed the reliability of the informant. Under these circumstances, where two government inspectors were working closely together in related investigations, it can hardly be considered false to regard the information as given to both officers, and any failure to make the separation of responsibility crystal clear cannot conceivably have influenced the commissioner to issue a warrant he would otherwise have denied. Cf. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed. 2d 684 (1965).

▮▮ The next challenge is directed at a seizure incident to an allegedly illegal arrest of Guzzo. Along with the warrant to search Guzzo's house, the commissioner signed a warrant authorizing Guzzo's arrest for the transportation and sale of stamps stolen from the Paramus Post Office. The arrest warrant was based on a complaint in which Inspector Pallantios gave as the source of his information and the grounds of his belief both his own investigation of the burglary and "an oral statement given to your deponent by a previously reliable confidential informant"; the statement was alleged to have related that Mulhearn, Jones and confederates perpetrated the crime, and that they "together with the defendant NICK GUZZO, who knew said stamps were stolen, transported said stolen stamps * * * from New Jersey to Brooklyn" where they sold them to Guar-

nieri for $9,500. Pursuant to the warrant Guzzo was arrested in his car, which was searched then and there; the search revealed the burglary tools Guarnieri had made available to Kuhle and the others. The claim pressed by all the appellants except DeLutro is that the complaint was insufficient, the arrest thus invalid, the search thus illegal, and the evidence thus excludible against all of them.[22]

▮ Our views as to standing rule out all challenges save Guarnieri's. Assuming that his ownership of the tools gives him standing, see United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), we find his attack without merit. The complaint of Inspector Pallantios sufficiently alleged a basis for crediting the hearsay statement in attesting to the previous reliability of the informant, see United States v. Freeman, 358 F.2d 459 (2 Cir. 1966). And though by itself it may have failed to provide "some of the underlying circumstances from which the informant concluded" that his information was correct, Aguilar v. State of Texas, 378 U.S. 108, 114, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964); United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), any such deficiency was effectively cured by the contemporaneous application for the search warrant dealing with the same crime, alleging that the informant had observed the burglar's tools and gun stolen from the Hillsdale Post Office in the possession of Guzzo and the other defendants named in the complaint. See United States v. Markis, 352 F.2d 860, 864 (2 Cir. 1965). Finally, although Judge Mishler did not find it necessary to go into the subject, it is patent there was ample basis for the officers' believing that Guzzo had committed a felony and making the arrest without a warrant; appellants seem unaware of our holding that a defect in a warrant does not vitiate an arrest made under such circumstances as here if probable cause in fact existed. United States

---

22. The alleged illegality of Guzzo's arrest is urged as an additional ground for attacking the use of his statement dis-

cussed in Point IV, see Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

v. Hall, 348 F.2d 837, 841–842 (2 Cir.) cert. denied, 382 U.S. 910, 86 S.Ct. 250, 15 L.Ed.2d 161 (1965).

A third attack, by Bozza, Mulhearn, Jones and Pizzo, is directed to the search of Kuhle's house by New Jersey police which led to the discovery of the tools used in the first four burglaries. Disregarding Bozza's contention for lack of standing but again assuming that appellants' co-ownership of the tools gives this under United States v. Jeffers, supra, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59, and also—which is doubtful at least as to Mulhearn and Jones—that proper objection was made, we find that the search and seizure were valid.

 The warrant for the search of Kuhle's house was issued by a New Jersey judge on the affidavit of Sergeant Fowler, a state police officer. Fowler swore that he had investigated the burglary of a New Jersey motor vehicle agency from which two validating machines, numerous blank forms, and a quantity of inspection stickers had been stolen; that he had questioned a William Brown who reported having purchased two stolen drivers' licenses from Kuhle that were found in his possession and who also admitted the purchase from Kuhle of ten checks, likewise found in his possession, stolen from a coal company in the same county; and that this gave Fowler reason to believe that Kuhle possessed stolen property in his house in violation of New Jersey law. Not questioning that the state judge would have had probable cause if Brown also had made an affidavit, appellants contend it was fatal that Fowler's affidavit did not state that Brown was a previously reliable informer. Such a recital, however, is only one way of validating hearsay used to obtain a search warrant—not a ritual that must be invariably observed even when the circumstances render it inappropriate. The constitutional requirement is that there be "substantial basis" for the magistrate's concluding that an offense was being committed, Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); that, where the application is based on the statement of another person, "a substantial basis for crediting the hearsay" be presented, Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960); and that to this end the magistrate must be informed of "some of the underlying circumstances from which the officer concluded that the informant * * * was 'credible' or his information 'reliable,'" Aguilar v. State of Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). The identity of the licenses found on Brown with those known by Fowler to have been stolen was a far stronger reason for believing Brown's story than a record of an informer's previous reliability; assuming as we do that Brown was not an informer in the usual sense, it is hard to see what more Fowler could have presented if Brown's equivocal status made him unwilling to swear to an affidavit. The Fourth Amendment's prohibition of unreasonable searches and seizures is not to be read as imposing burdens on the police beyond their power to meet.

### VII. *Other points.*

Remarkably few objections are made to the method in which Judge Mishler put this complicated case to the jury, and only one requires comment in view of our disposition of the case. The judge gave the jurors a four-page précis of the counts of the indictment submitted for their verdict rather than sending the full text as he could properly have done. The contention pressed by Jones and other appellants is that the summary omitted some essential elements of the crimes. However, in his charge the judge read each count and fully explained what the jury must find in order to convict. The expedient adopted was commendable in promoting informed consideration by the jury. Although we find no error, a charge given on the new trial could make the abbreviated nature of the précis a shade clearer and the summary of Count 28 should show that the indictment charged Guarnieri only with knowledge that Bozza had committed the Keyport burglary.

We have carefully examined appellants' other contentions, notably their claims of insufficient evidence to warrant submission to the jury of Count 6 as to Jones, Mulhearn and Pizzo and of Counts 21, 23 and 24 as to Guarnieri, their objection to the admissibility of Kuhle's story of the proposal to kill the informer, and their objection to Inspector Shatzel's testimony as to the burglary tools. We find all these so lacking in merit as not to warrant discussion.

The convictions of Bozza on Count 5 and of DeLutro, Mulhearn, Pizzo and Jones on Count 26 are vacated and the counts dismissed for lack of venue in the Eastern District of New York, the remaining convictions of Jones are affirmed, and all other judgments of conviction are reversed for a new trial.

## APPENDIX

| Count | | Defendants | Post Office | Sentence |
|---|---|---|---|---|
| 1— | Transporting stolen stamps | Bozza | Morganville Middletown | Ten years consecutive to 6 and 24 but concurrent with 4, 5 and 23 |
| 4 & 5— | Aiding and abetting receiving of stolen stamps | Bozza | Woodbridge Keyport | Ten years on each count consecutive to 6 and 24 but concurrent with each other, 1 and 23 |
| 6— | Conspiracy to break into post offices and to transport and receive stolen stamps | Bozza | Morganville | Four years concurrent with 24 |
| | | Jones | Middletown | Four years concurrent with 23, 24, 26 and 27 |
| | | Mulhearn | Woodbridge | Four years concurrent with 23, 24, 26 and 27 |
| | | Pizzo | Keyport | Four years |
| 21— | Aiding and abetting forcible entry with intent to commit larceny | Guarnieri | Paramus | Four years concurrent with 23, 24 and 28 |
| 23— | Receiving and retaining stolen stamps | Guarnieri | Paramus | Four years concurrent with 21, 24 and 28. |
| — | Aiding and abetting | Bozza | Paramus | Ten years consecutive to 6 and 24 but concurrent with 1, 4 and 5 |
| | | Jones | | Nine years concurrent with 6, 24, 26 and 27 |
| | | Mulhearn | | Nine years concurrent with 6, 24, 26 and 27 |
| 24— | Conspiracy to break into post office, and to transport and receive stolen stamps | Bozza | Paramus | Four years concurrent with 6 |
| | | Jones | | Four years concurrent with 6 and 27 |
| | | Mulhearn | | Four years concurrent with 6 and 27 |
| | | Guarnieri | | Four years concurrent with 21, 23 and 28 |

| Count | | Defendants | Post Office | Sentence |
|---|---|---|---|---|
| 26— | Receiving stolen stamps | DeLutro | Hillsdale | Two years |
| — | Aiding and abetting | Jones | | Nine years concurrent with 6, 23, 24 and 27 |
| | | Mulhearn | | Nine years concurrent with 6, 23, 24 and 27 |
| | | Pizzo | | Ten years consecutive to 6 but concurrent with 27 |
| 27— | Conspiracy to break into post office, and to transport and receive stolen stamps | Jones | Hillsdale | Four years concurrent with 6 and 24 |
| | | Mulhearn | | Four years concurrent with 6 and 24 |
| | | Pizzo | | Five years consecutive to 6 but concurrent with 26 |
| 28— | Comforting and assisting offender to hinder and prevent apprehension | Guarnieri | | Four years concurrent with 21, 23 and 24. |

———◆———

MOORE, Circuit Judge (dissenting in part and concurring in part):

The majority, sure that "the evidence apart from Jones' confession was ample for convictions on all counts if the jury believed Kuhle," reverses, albeit "with regret," five convictions after a long multi-defendant trial conducted by the trial judge in a manner "painstaking and adept." However, this case should serve a far more useful purpose than the mere remand and retrial of five defendants. The result and the opinion itself clearly advises all prosecutors and trial judges, who rely upon previous law in permitting multi-defendant trials in which a confession or a statement of one particular defendant may be offered and which the jury by employing common intelligence might speculate or conclude involved other defendants, that they so rely at their peril. Rule 8 of the Rules of Criminal Procedure permits joinder of offenses and defendants. Rule 14, providing for relief from prejudicial joinder, allows the court to order separate trials of counts or "grant a severance of defendants or provide whatever other relief justice requires." 18 U.S.C. § 371 makes it a crime for two or more persons to conspire to commit an offense against the United States. Thus, presumably the law would sanction the joint trial of two or more conspirators. At such a trial, it is more than conceivable—at least past experience so teaches—that a statement or confession given, of course, under such circumstances as to be admissible, would be offered as evidence of the guilt of the defendant, who, ill-advisedly or non-advisedly or merely from a desire to relieve his conscience, admitted his guilt. Since this defendant would have had more than ordinary difficulty in conspiring with himself his confession will undoubtedly implicate others. Now arises the problem—how to protect the confrontation rights of the other defendants. Quite obviously, if the other defendants are mentioned by name, no instruction to disregard that which they have heard can be effective to erase this vital information from any normal

juror's mind. The common sense approach of Judge Learned Hand [1] and Mr. Justice Jackson [2] cannot be seriously questioned. Faced with the dilemma of no conspiracy trials or exclusion of perfectly admissible testimony against the confessing defendant, the trial judges have had to resort to various devices, some even suggested by appellate courts, the success of which can be known only after some other appellate court substitutes its discretion for that, in theory, possessed by the trial court.

The principal [3] question on appeal centers around Jones' confession. Because of its admission in evidence, the majority reverse. For all practical purposes, the decision must of necessity seriously affect all future multi-defendant trials. Up to the present time, this court has accepted the assumption that "[u]nless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense." Delli Paoli v. United States, 352 U.S. 232, 242, 77 S.Ct. 294, 300, 1 L.Ed.2d 278 (1957). The very nature of our method of developing facts by the examination of witnesses requires this assumption. All witnesses cannot testify simultaneously. Each tells of the facts known to him—facts which frequently are quite fragmentary. Into what part these pieces will fit in the mosaic picture the prosecutor or the defense is creating cannot be known until the picture is completed. Thus, testimony must be accepted subject to connection or to motion to strike if some future witness does not supply a connecting link. Yet the jury has heard the testimony which has reached, and made a permanent impression on, the jury mind. And so has the damaging answer unexpectedly given which is dealt with by "Strike it out; the jury will disregard the answer." Rarely in a trial of any duration are there not countless incidents which require and receive such court instruction and admonition.

Turning to the particular situation which faced the trial judge here, I find a quite uncomplicated series of post office burglaries in which various combinations of the defendants participated. The period of time during which the robberies occurred was short (January–June 1964) but during this period six post offices were robbed. The only problem for the jury was which defendants, if any, participated in which robbery. On January 25, 1964 Bozza and Kuhle using Mulhearn-Jones-Pizzo tools robbed the Morganville, N. J. post office; January 28, 1964 Bozza and Kuhle (same tools), Middletown, N. J.; February 17, 1964, Bozza, Kuhle and Williams (same tools), Woodbridge, N. J.; March 12, 1964, Bozza, Kuhle and Williams (same tools), Keyport, N. J.; June 3, 1964, Bozza, Kuhle and Jones (Guarnieri's tools), Paramus, N. J.; and June 23, 1964, Kuhle, Mulhearn and Jones (Guarnieri's tools), Hillsdale, N. J. To dispose of the stolen stamps, many trips were made from the New Jersey area to New York (S.D.N.Y.), Brooklyn and Astoria (E.D.N.Y.). The brevity of the jury's deliberation (3½ hours) would seem to attest the lack of complexity. Bozza (five times) and Kuhle (six times) were the active participants, joined by Williams (twice), Jones (twice) and Mulhearn (once).

1. Nash v. United States, 54 F.2d 1006 (2d Cir. 1932); United States v. Delli Paoli, 229 F.2d 319 (2d Cir. 1956).

2. Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

3. I am not unmindful of, nor do I ignore or minimize the other points dealt with by the majority. With the treatment of the admission of testimony relating to the Fairview Post Office burglary, the cross-examination of Guzzo regarding his prearraignment statements, the search and seizure objections and the appellants' other contentions covered in the majority opinion under "VII. Other points." I am in agreement. I am also in accord with the majority's decision with respect to venue as to Count 26 and Count 5 as to Bozza.

The trial proceeded in orderly course until it became necessary for the prosecution to introduce against Jones a written confession by him, given to a postal inspector which implicated the other defendants as to two of the six robberies, Paramus and Hillsdale. At this point, counsel for the implicated defendants moved for a severance. All that the trial judge had to guide him in ruling upon this motion was the law, particularly as revealed by the cases in this Circuit. Being (as the majority conceded) "painstaking and adept in his conduct of this difficult trial," he must have known that Judge Learned Hand in a philosophical and possibly quixotic mood had commented unfavorably upon the admission of a co-defendant's statement "under the recognized subterfuge of an instruction to the jury to confine its use to him" and had intimated that "if we were to reframe the law of evidence" the statement might better be kept out. Nash v. United States, 54 F.2d 1006 (2 Cir. 1932). The importance of the opinion and unanimous decision is that the judgment of conviction was affirmed and that the admission of the implicating statement was not held to be reversible error. The opening sentence of the opinion is "The guilt of the defendant is so plain that only some serious blunder in the conduct of the trial should result in a reversal." In other words, although Judge Hand was philosophizing as to a jury's mental gymnastics, he and his colleagues—Swan and A. N. Hand, C.J.J.—actually decided that "the rules ought to be observed so far as they can * * *."

The next question for the trial judge would have been: how best to protect the other defendants and still receive the admissible-against-Jones confession? *Delli Paoli* indicated that under protective instructions even the names of the other defendants could be disclosed. However, the trial judge here not only gave instructions "sufficiently clear" (352 U.S. at 239, 77 S.Ct. 294) "as Judge Mishler's certainly were in this case" (majority) but he followed appellate court suggestion that the names of the other defendants be blanked out.

This Circuit has over the years been surfeited with the multi-defendant case, thus affording this court ample opportunity to declare itself on the issues vital in this appeal, namely, failure to sever and admission of Jones' confession.[4]

The Motion to Sever

The rule as to motions for severance is stated succinctly in Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954):

> "It was within the sound discretion of the trial judge as to whether the defendants should be tried together or severally * * *. To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions."

In 1959 this court said "To grant or deny such motion lies in the sound discretion of the trial court (citing cases)." United

4. United States v. Kelly, 2 Cir., 349 F.2d 720 (1965).
United States v. Castellana, 2 Cir., 349 F.2d 264 (1965), cert. denied, 383 U.S. 928, 86 S.Ct. 935, 15 L.Ed.2d 847 (1966).
United States v. Brown, 2 Cir., 335 F.2d 170 (1964).
United States v. Houlihan, 2 Cir., 332 F.2d 8, cert. denied, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964).
United States v. Bentvena, 2 Cir., 319 F.2d 916, cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).
United States v. Agueci, 2 Cir., 310 F.2d 817, 99 A.L.R.2d 788 (1962), cert. de-

nied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).
United States v. Manfredi, 2 Cir., 275 F.2d 588, cert. denied, 363 U.S. 828, 80 S.Ct. 1598, 4 L.Ed.2d 1523 (1960).
United States v. Aviles, 2 Cir., 274 F.2d 179 (1959), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960).
United States v. Stromberg, 2 Cir., 268 F.2d 256, cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).
United States v. Caron, 2 Cir., 266 F.2d 49 (1959).
United States v. Delli Paoli, 2 Cir., 229 F.2d 319 (1956), aff'd, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

States v. Caron, 2 Cir., 266 F.2d 49, 51. However, this principle virtually vanishes if the real discretion is to be that of the reviewing court. The disagreement with the trial court will doubtless be phrased in terms of "abuse of discretion" but in final analysis the appellate court is merely saying, with the advantage of a completed trial record before it, that it would in retrospect have acted otherwise.

### The Admission of Jones' Confession

When *Delli Paoli* was in this court, Judge Learned Hand stated and answered the problem, thus:

> "Unhappily, it is extremely difficult to escape the dilemma that must always arise on such occasions, because on the one hand the declaration should remain unimpaired as against the declarant, and yet it must be in some measure mutilated in favor of the others. At best the solution is especially a matter for the exercise of discretion by the trial judge."

229 F.2d 319 (1956).

Here the mutilation was carried out to the maximum degree, short of excluding the confession entirely, because all other names were blanked out. In addition, the trial judge's instructions were so clear and so frequent as to the limited purpose of the Jones' confession that the only error must be premised upon the assumption that the jury was incapable of following them.

Yet this court as recently as 1965 has accepted as still valid the Supreme Court's views regarding the jury's function, namely, that " '[u]nless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense.' [Delli Paoli v. United States] 352 U.S. at 242, 77 S.Ct. at 300." United States v. Castellana, 349 F.2d 264, 275 (2d Cir. 1965).

The extent to which we have gone in our jury trust is well illustrated in the decision in United States v. Elgisser, 2 Cir., 334 F.2d 103, 107 (1964) where considerable testimony was admitted in support of the conspiracy count (the subject-to-connection type of proof). The conspiracy count was dismissed by the trial court. Naturally the jury had heard all the evidence—hearsay except for the conspiracy exception—legally admissible only on the conspiracy theory. Nevertheless, this court held that the limiting instructions by the trial court adequately protected the defendants.

Quite apart from the questions of severance and jury instructions, I find myself in disagreement with the majority in certain other fundamentals. I had always thought that it was the jury's function to decide upon the credibility of witnesses after observing their general demeanor and comportment. The usual charge instructs the jury that mere weight of numbers is not decisive and that one may be believed to the exclusion of the many. The majority, however, more than intimate that the Jones' confession strongly buttressed the witness Kuhle who gave "the heavily attacked testimony of an accomplice on which the prosecution almost entirely depended for proof of guilt." To be sure, Kuhle was an accomplice with a criminal record but the trial judge warned the jury to view his testimony in the light of these facts. It is scarcely appropriate for this court to speculate as to the weight the jury gave to each particle of evidence and substitute its own appraisal thereon. If the jury believed Kuhle, as they certainly were entitled to do, and if the majority has "relatively little doubt [the jury] would have [believed him] even without the impressive corroboration which the confession furnished," the very foundation upon which this court has relied in the past exists upon which to base a holding that the strength of other evidence plus careful instructions are sufficient to negate prejudice.

Of more than ordinary significance in relation to this case is the recent decision of the Supreme Court in Johnson and Cassidy v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Although the case is publicized largely because of its holding that the princi-

ples announced in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are to be applied prospectively from the dates of those decisions, other important issues were involved. The defendants had been convicted of first degree murder and were under sentence of death. Their confessions were offered in evidence by the State at their joint trial. As petitioners in the Supreme Court, they argued as one of their points that

"Where Motions for Severance Are Denied, and Three Defendants are Tried Jointly, and the Confessions of Each, Expressly Implicating the Others, Are Admitted into Evidence over Objection, and Where Two of the Confessions Given by One of the Defendants Are Held to be Coerced, Justice Requires that the Other Defendants be Granted a New Trial Free from the Prejudicial Effect of the Coerced Confessions."

There, as here, pre-trial motions for severance were made and denied. The Supreme Court of New Jersey concluded that separate trials would have created almost insurmountable problems of administration; that the trial judge gave proper instructions that the confession of one defendant was not binding on the other; and that there was no abuse of discretion in denying the severance. State v. Johnson, 31 N.J. 489, 158 A.2d 11 (1960). In the Supreme Court, petitioners argued that "it is a legal fiction to believe that the jury in this case was able to separate the confessions of each of these defendants and compartmentalize them," and referred to People v. Aranda, 63 Cal.2d 518, 47 Cal.Rep. 353, 407 P.2d 265 (1965, Traynor, C. J.) criticizing joint trials. The dissent (Mr. Justice Frankfurter writing for four members of the Court) in Delli Paoli was stressed wherein he ex-

presses the opinion that jurors cannot by instructions to disregard erase from their minds that which they have heard. The Supreme Court, however, affirmed the convictions and disposed of these arguments by saying: "Petitioners challenge the validity of their convictions on several other grounds, all of which we have examined with great care, including the claim that their confessions were coerced. We conclude without unnecessary discussion that those grounds which may be tested on this direct review of the judgment of the New Jersey Supreme Court are without merit." If these arguments be "without merit" in a capital case, they do not support reversible error here.

In *Johnson* and *Cassidy*, the Supreme Court in establishing guidelines for future prosecutive procedure at least gave notice so that there would be some opportunity for compliance. However, the majority here elevate as the law of the land, at the time these defendants were tried, the dissenting opinion of Judge Frank in *Delli Paoli*, 229 F.2d at 322 which opinion was not followed by the majority on the Supreme Court, and the dissenting opinion in the Supreme Court in that case.

By judicial fiat the majority, in effect, repeal the Rule as to severance, change the law as to the trial court's discretion and cast more than serious doubt on the value of a judge's instructions. For all practical purposes any confession in any multi-defendant trial becomes unusable or inadmissible. Here the alternative would be thirty-six separate trials (six defendants, six post offices). If the same logic, which elevates dissenting opinions to the status of law, were applied to this case, I would regard the result here with greater equanimity.

I would affirm all convictions except under Count 26 and Count 5 as it relates to Bozza.